21 CV      8549

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                   :
DAWN M. JOYNER, *Sui Juris*,                                       :      Case No. _____
                                                                   :
                                                                   :
                    Plaintiff,                                     :
                                                                   :
                                                                   :
        v.                                                         :
                                                                   :
ALSTON & BIRD LLP, RICHARD HAYS, in his official                   :
and individual capacities, CATHY BENTON, in her official          :
and individual capacities, and MICHAEL STEPHENS,                   :
in his official and individual capacities,                         :
                                                                   :
                                                                   :
                    Defendants.                                    :
                                                                   :
-------------------------------------------------------------------X

## COMPLAINT

COMES NOW DAWN M. JOYNER ("Plaintiff"), an aggrieved party, appearing before this Court, without waiving any rights, remedies or defenses, statutory or procedural, and hereby complains of ALSTON & BIRD LLP ("Alston & Bird" or "the Firm"), RICHARD HAYS ("Hays"), CATHY BENTON ("Benton"), and MICHAEL STEPHENS ("Stephens") (collectively, "Defendants"), jointly and severally, and alleges as follows:

## PRELIMINARY STATEMENT

1.      Alston & Bird, by and through its employees, including, but not limited to, Hays, Benton and Stephens, violated Plaintiff's federally protected rights guaranteed by the 1st, 13th and 14th Amendments to the United States Constitution ("Constitution").

## NATURE OF THE ACTION

2.      Alston & Bird, by and through its employees, including, but not limited to, Hays, Benton and Stephens, willfully deprived Plaintiff of her federally protected rights and conspired to deprive Plaintiff of her federally protected rights guaranteed by the 1st and 13th Amendments to the Constitution under the protective mantle of 42 U.S.C. § 1983.

3.      Alston & Bird, by and through its employees, including, but not limited to, Hays, Benton and Stephens, conspired to interfere with Plaintiff's federally protected rights guaranteed by the 14th Amendment to the Constitution under the protective mantle of 42 U.S.C. § 1985(3).

4.      Alston & Bird caused Plaintiff to waive her federally protected rights by forcing her into an extrinsic contractual agreement with government (federal and state) entities, without her knowing, willing, intentional, voluntary, and explicit written consent, where no legal or lawful basis or authorization exists.

5.      Alston & Bird intermeddled in Plaintiff's private affairs and engaged in unlawful collection actions, that is, its nonconsensual taking ("wrongful taking") of Plaintiff's earnings derived from her personal labor ("private property"), for payment of a public debt, where no legal or lawful basis or authorization exists.

6.      Alston & Bird coerced Plaintiff to disclose and use her private and confidential information on government (federal and state) forms ("voluntary forms") as a mandatory requirement for employment, where no legal or lawful basis or authorization exists.

7.      Alston & Bird filed information returns and published, divulged, and disclosed Plaintiff's private and confidential information to government entities, without her knowing, willing, intentional, voluntary, and explicit written consent, where no legal or lawful basis or authorization exists.

8.     Plaintiff brings this action for the recovery of money damages, in commerce, for injuries suffered as a direct result of Defendants' egregious misconduct under Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352, 78 Stat. 241, approved July 2, 1964, as amended, 42 U.S.C. § 2000e, et seq.) ("Title VII"), which provides a mechanism for seeking redress to individuals who have been deprived of their federally protected rights – constitutional and statutory.

9.     Plaintiff brings this action for declaratory relief and permanent injunction under the Privacy Act of 1974 (Pub. L. 93–579, 88 Stat. 1896, enacted December 31, 1974, as amended, 5 U.S.C. § 552a) ("Privacy Act") for Alston & Bird's failure to conform to the social security disclosure requirements of the Privacy Act.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331 – Federal Question and 28 U.S.C. § 1343 – Civil Rights and Elective Franchise.

11.     Declaratory and injunctive relief is sought as authorized in 28 U.S.C. §§ 2201 and 2202.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claim occurred in this district.

## PARTIES

13.     Plaintiff is an African-American Woman, a Private Citizen of New York State and a resident of New York City in the borough of Brooklyn.

14.     At all material times, Plaintiff was employed as a Legal Secretary and Legal Administrative Assistant at Alston & Bird.

3

15.     At all material times, Plaintiff was competent to make informed decisions and determinations about her private, commercial and legal affairs without arbitrary interference.

16.     Upon information and belief, Defendant Alston & Bird, a Georgia Limited Liability Partnership, is a registered corporation of the State government (Identification Number: 580137615), with its principal place of business at One Atlantic Center, 1201 West Peachtree Street, NW, in the city of Atlanta, transacting business in the state of Georgia, for the state of Georgia.

17.     At all material times, Alston & Bird is a registered corporation of the federal government (Federal Employer Identification Number: 58-0137615) transacting business in the several states of the United States, for the federal government.

18.     At all material times, Alston & Bird maintained an office as a foreign entity in the city of New York, transacting business in the state of New York, for the state of New York.

19.     Upon information and belief, Defendants Hays, Benton and Stephens are United States citizens domiciled in the state of Georgia.

20.     At all material times, Hays was Chairman and Managing Partner of Alston & Bird, engaged in the overall management of the Firm, with supervisory authority over Benton and Stephens. Mr. Hays is liable in this action under the doctrine of *respondeat superior*.

21.     At all material times, Benton was Chief Human Resources Officer of Alston & Bird, a direct report to Hays, engaged in the human resource management of the Firm, with supervisory authority over Plaintiff.

22.     At all material times, Stephens was Director of Human Resources and Diversity of Alston & Bird, a direct report to Benton, engaged in the human resource management of the Firm, with supervisory authority over Plaintiff.

4

## STATEMENT OF FACTS

23. On or about October 1, 2007, Alston & Bird memorialized the agreed-upon terms of an oral contract for Plaintiff's employment in the form of a written offer letter ("offer letter"). (Exhibit A)

24. On or about October 10, 2007, Plaintiff accepted Alston & Bird's offer to pay a specified amount ("promised pay") for her performance as a Legal Secretary in Intellectual Property Litigation ("performance obligations").

25. On or about November 12, 2007, Alston & Bird requested that Plaintiff complete voluntary forms as a mandatory requirement for employment.

26. On or about November 15, 2007, Alston & Bird commenced its wrongful taking – trespassing upon, siphoning and extorting Plaintiff's private property.

27. On or about April 30, 2019, Plaintiff submitted a written, signed memorandum requesting that the Firm terminate the voluntary forms ("termination request"). (Exhibit B)

28. On or about May 14, 2019, Plaintiff requested the legal documentation the Firm was relying upon to establish a legal or lawful basis or authorization for its wrongful taking and to support its decision to infringe upon Plaintiff's federally protected rights from Stephens.

29. On or about May 14, 2019, Benton and Stephens threatened to terminate Plaintiff for exercising her federally protected rights.

30. On or about June 24, 2019, Plaintiff was forced to resign as a direct result of Defendants' violation of her federally protected rights.

31. On or about November 12, 2020, Plaintiff requested legal documentation the Firm was relying upon to establish a legal or lawful basis or authorization for its wrongful taking and to support its decision to infringe upon Plaintiff's federally protected rights from Hays. (Exhibit C)

32.     On or about November 20, 2020, Glenn Patton, a partner in the Atlanta office and the Firm's in-house employment counsel ("Patton"), responded to Plaintiff's request on behalf of Hays.

33.     On or about November 25 2020, Patton informed Plaintiff in a telephone conference that, although the Firm had not done anything wrong, they were open for a pre-trial settlement proposal.

## FIRST CAUSE OF ACTION
## VIOLATION OF 42 U.S.C. § 1983
### *Against All Defendants*

**I.      Defendants violated Plaintiff's federally protected rights guaranteed by the First Amendment to the Constitution**

**A.      Defendants deprived Plaintiff of her federally protected right to free exercise of religion**

34.     Plaintiff repeats, reiterates, re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

35.     Plaintiff is a creation of the Most High God, the Creator of Heaven and earth and the Master of the Universe by Whom all things were made, and without Him nothing was made that was made (Genesis 1:26; John 1:3).

36.     As a born-again, Spirit-filled Believer, Plaintiff's domicile is the Kingdom of Heaven. Plaintiff is a Kingdom Queen exiled on earth eagerly awaiting the return of Yeshua HaMashiach, the Anointed One (Psalm 110:1).

37.     Plaintiff is an Ambassador of a legislatively foreign jurisdiction and officer of the Kingdom of Heaven, a private foreign corporation, and acting as a fiduciary, agent and trustee on behalf of the only Sovereign God, Who is the Source of ALL sovereignty.

38.     As a Believer in the Most High God, Plaintiff owes a duty to Him not to engage in presumptions and not to encourage, condone or participate in the presumptions of others. This is not only an act of "self-defense" but also the practice of all Believers in the Most High God who take their faith in God's law seriously.

39.     If Plaintiff allows a "ruler" to be above her, she has committed idolatry (Exodus 20:3) and terminated the Most High God as her Sovereign Protector (Psalm 91) and Source (Philippians 4:19).

40.     Those who don't believe in God are incapable of understanding Plaintiff's personal responsibility and accountability to a higher Power, Who is the Most High God, and not to any vain man or civil ruler (1 Corinthians 2:14).

41.     Plaintiff acts in strict obedience to the laws of the Most High God. Plaintiff is not superior in any way to any human being within the jurisdiction of the courts of the country. Plaintiff possesses the same sovereign immunity as any government.

42.     Plaintiff reserves all of her fundamental, natural and common law rights and delegates NONE to any *de facto* government. Any attempt of a *de facto* government to interfere with Plaintiff's ability to act as God's fiduciary is a direct interference with Plaintiff's right to contract and her free exercise of religion.

43.     For twelve (12) years, Plaintiff unknowingly, unwillingly, unintentionally and involuntarily allowed Alston & Bird to be a "ruler" above her, directly interfering with Plaintiff's federally protected right to free exercise of religion.

44.     On or about April 17, 2019, upon discovering Alston & Bird's wrongful taking of Plaintiff's private property for payment of a public debt, including, but not limited to, the social

security system, Plaintiff initiated a conversation in an attempt to remedy the Firm's egregious misconduct.

45.     Between April 17, 2019 and April 30, 2019, Plaintiff engaged in a futile email exchange with Lynn Nabors ("Nabors"), the manager of the Firm's payroll department.

46.     On or about April 30, 2019, Plaintiff furnished Alston & Bird with a termination request citing the legal authority on which her request was based.

47.     Alston & Bird failed, refused or neglected to honor Plaintiff's termination request and continued its wrongful taking after April 30, 2019.

48.     Alston & Bird's failure, refusal or neglect to honor Plaintiff's termination request deprived Plaintiff of her federally protected right to free exercise of religion.

**B.     Defendants conspired to deprived Plaintiff of her federally protected right to free exercise of religion**

49.     Two weeks after Plaintiff submitted her termination request to the Firm, Plaintiff was summoned to attend a telephone conference with Stephens on May 13, 2021, in the presence of Elena Hegel, Human Resources & Attorney Hiring Coordinator.

50.     During the telephone conference, Stephens informed Plaintiff that the Firm could not "consider" her requests. Plaintiff's attempts to be heard were shut down and met with a barrage of rude interruptions by Stephens – "Dawn, you need to take your tone down a notch." "This is our final decision." "We are not going down this road." Stephens concluded the conversation by informing Plaintiff that, if she did not like said final decision, she "should find someplace else to work."

51.     On May 14, 2019, Benton reinforced Stephens' reprimand stating, "[w]e are not going to engage back and forth about the Firm's tax withholding obligations. If the Firm's

response on this issue is unsatisfactory to you, then you should pursue other employment options."

52.     Benton and Stephens failed, refused or neglected to give Plaintiff the opportunity to be heard before deciding not to "consider" her requests.

53.     Benton and Stephens conspired to deprive Plaintiff of her right to exercise free religion by threatening to terminate Plaintiff's employment should she continue to exercise her federally protected rights.

54.     Between April 30, 2019 and May 14, 2019, Alston & Bird, by and through its employees, conspired to deprive Plaintiff of her right to free exercise of religion by disseminating disinformation and misinformation about the validity of her request.

55.     On or about May 29, 2020, in its position statement ("position statement") to the Equal Employment Opportunity Commission ("EEOC"), the Firm alleged that, "it is literally impossible for A&B to have discriminated against Charging Party because of her religious or national origin because the Firm was not aware of her religious beliefs or national origin at any time prior to her resignation of employment."

56.     Plaintiff's reasons for making the requests are none of Alston & Bird's business. Plaintiff did not owe the Firm any explanation as to WHY she submitted her requests.

57.     However, if the Firm had given Plaintiff the opportunity to be heard before deciding not to "consider" her requests, it would have been aware of Plaintiff's religious beliefs.

58.     Instead, the Firm sought to censor and reprimand Plaintiff and threaten her employment should she continue to exercise her federally protected rights.

59.     Plaintiff has deep convictions and beliefs regarding the social security number and its similarities to the characteristics of the Mark of the Beast spoken of in Revelation 13.

60.     Plaintiff has deep convictions and beliefs about not subsidizing socialism through the social security "system."

61.     Alston & Bird failed, refused or neglected to "reasonably accommodate" Plaintiff's religious beliefs and practices.

62.     Honoring Plaintiff's request would not have put any undue burden on the operation of the Firm's business, as the Firm would have simply stopped its wrongful taking.

63.     Defendants willfully deprived and conspired to deprive Plaintiff of her federally protected 1st amendment right to free exercise of religion with its intransigent failure, refusal or neglect to reasonably accommodate Plaintiff's requests.

## II.     Defendants violated Plaintiff's federally protected rights guaranteed by the Thirteenth Amendment to the Constitution

### A.     Twelve Years a Slave

64.     For twelve years, Plaintiff was a slave – a "peon" on the Alston & Bird plantation – being wholly subjected to the will of the Firm, having no freedom of action, whose person and services were wholly under control of the Firm.

65.     This reality became evident to Plaintiff when, upon discovering Alston & Bird's wrongful taking of her private property, her attempt to remedy the Firm's egregious misconduct was met with hostile resistance.

66.     On November 12, 2007 at 8:30 a.m., Plaintiff attended the new hire orientation where she received a package of employment forms, including voluntary forms for withholding payroll taxes.

67.     Benton and Stephens, who are both certified by the Society of Human Resource Management ("SHRM"), are the architects of the new hire orientation package.

68.     Alston & Bird, by and through its payroll representative (Plaintiff does not recall the exact individual), presented Plaintiff with the voluntary forms as a mandatory requirement for Plaintiff's employment. The payroll representative requested that Plaintiff complete the voluntary forms.

69.     There is no law that requires Plaintiff to submit Form W-4 or W-9 (or their state equivalents) as a mandatory requirement for employment.

70.     There is no law that requires Plaintiff to obtain a social security number or to disclose or use the social security number that was assigned to her as a mandatory requirement for employment.

71.     Plaintiff's filing of Form W-4 (and its state equivalents) with the social security number assigned to Plaintiff with the Firm should have been voluntary, not mandatory.

72.     Alston & Bird obtained Plaintiff's signature on these voluntary forms by deception, compelling Plaintiff to sign said voluntary forms without full disclosure of information that may have influenced Plaintiff's decision to consent or not to consent.

73.     Alston & Bird obtained Plaintiff's signature on these voluntary forms by coercion, compelling Plaintiff to sign said voluntary forms as a mandatory requirement for employment.

74.     Plaintiff was unaware, and rebuts the presumption that she was aware, that these forms were voluntary in nature and not a mandatory requirement for her employment.

75.     By deceitfully and coercively obtaining Plaintiff's signature on these voluntary forms was her "consent", albeit unknowingly, unwillingly, unintentionally, involuntarily, and inexplicitly, Alston & Bird fraudulently induced her into an extrinsic contractual agreement.

76.     Plaintiff did not retain or engage Alston & Bird's services or complete a power of attorney for the Firm to represent her in private, commercial or legal affairs.

77.     Alston & Bird had no legal or lawful basis or authorization to bind Plaintiff into an extrinsic contractual agreement.

78.     Alston & Bird knowingly, willfully, intentionally and recklessly caused Plaintiff to waive her federally protected rights, without her knowing, willing, intentional, voluntary, and explicit written consent, as a direct result of its failure to disclose the nature of the voluntary forms.

79.     Plaintiff had the right to reserve, and not waive, all of her federally protected rights, including, but not limited to, her right not be compelled to contract when completing any government form that creates any rights or benefits on behalf of the government.

80.     Plaintiff did not knowingly, willingly, intentionally, voluntarily, or explicitly give the Firm written consent to enroll her in any government programs or benefits.

81.     Without Plaintiff's knowing, willing, intentional, voluntary, and explicit written consent or a court order from a court of competent jurisdiction, the Firm illegally and unlawfully deducted and withheld amounts from Plaintiff's private property for taxes and garnishment.

82.     Consensual taking from pay occurs ONLY when Plaintiff knowingly, willingly, intentionally, and voluntarily elects, explicitly in writing, agrees to volunteer and requests to participate in any federal, state, city or county municipal corporate tax, program, insurance (disability, Medicare), trust (social security), including non-judicial tax levy, garnishment for taxes, tax offsets, tax interest or penalty and the Firm consents to such a request.

83.     Plaintiff did not complete Form 2159 – Payroll Deduction Agreement – granting Alston & Bird authorization to deduct and withhold Plaintiff's private property for payment of a public debt.

84.     There is no legal or lawful basis or authorization for Alston & Bird to deduct and withhold Plaintiff's private property for payment of a public debt. (Exhibit D)

85.     Plaintiff will use her 2018 base compensation to provide context for and demonstrate how the Firm's wrongful taking subjected Plaintiff to conditions of slavery, involuntary servitude and peonage for twelve (12) years.

86.     In 2018, Plaintiff's base compensation was approximately $90,000.00 annually, which is equivalent to $7,500.00 per month, for 20 days or 160 hours of performance.

87.     For fulfillment of 100% of her performance obligations, Alston & Bird reneged on its promised pay and paid Plaintiff approximately 66.96% of her annual base compensation, or $60,264.00 annually, which is equivalent to $5,022.00 per month, for 13 days or 107 hours of performance.

88.     Alston & Bird illegally and unlawfully withheld approximately 33.04% (25.26% for federal, state, and local income tax and an additional 7.78% for FICA and State Insurance Taxes), or $29,736.00 annually, which is equivalent to $2,478.00 per month, from Plaintiff's private property for payment of a public debt.

89.     Alston & Bird's wrongful taking compelled Plaintiff into involuntary servitude for 53 hours every month, which is equivalent to 7 days, for payment of a public debt.

90.     In 2018, Alston & Bird awarded Plaintiff a merit bonus of 3% of her base compensation, which was approximately $2,700.00.

91.     Alston & Bird illegally and unlawfully withheld approximately 50.0%, which is equivalent to $1,350.00, from Plaintiff's property for payment of a public debt.

92.     Plaintiff demands that Alston & Bird provide an accounting of the total amount of money it illegally and unlawfully trespassed upon, siphoned and extorted from Plaintiff's private property from November 40, 2007 through August 30, 2019.

93.    Alston & Bird contends that Plaintiff would have had to pay out-of-pocket whether or not the Firm withheld her taxes.

94.    During the November 25th telephone conference, Patton admitted, "[w]e thought you just didn't want to pay your taxes and we were not going to be part of that."

95.    Plaintiff did not retain or engage Alston & Bird's services or complete a power of attorney for the Firm to represent her in private, commercial or legal affairs.

96.    Plaintiff contends that whether or not she would have had to pay out-of-pocket is none of Alston & Bird's business.

97.    Plaintiff was unaware that the Firm had any legal or lawful basis or authorization to dictate how Plaintiff should spend her promised pay.

98.    Plaintiff was unaware that the Firm had expanded the mutually beneficial employer / employer relationship to an authoritarian master / slave relationship.

99.    This train of thought, however, clearly aligns with the, not so subtle, "slave mentality" entrenched in the culture on the Alston & Bird plantation.

100.    The Firm believed that they could dictate how and when Plaintiff was to pay for a public debt because it viewed Plaintiff as a "peon" on the Alston & Bird plantation.

101.    That is the only logical explanation for Alston & Bird's presumption that it had any authority whatsoever to make any decisions or determinations about Plaintiff's private, commercial or legal affairs.

102.    Otherwise, Plaintiff should have had the liberty to alter or terminate the "invisible" extrinsic contractual agreements that Alston & Bird deceived and coerced her into signing on November 12, 2007.

103.     Otherwise, Plaintiff should have had the liberty to pay out-of-pocket, if she so chose to do, which was her right to do.

104.     Alston & Bird reneged on its promised pay to Plaintiff pursuant to the offer letter. As the Firm has stated, the offer letter upon which Plaintiff relies is entirely silent on the subject of withholding/payroll taxes.

105.     Any amount deducted and withheld from Plaintiff's private property should have only been done with Plaintiff's knowing, willing, intentional, voluntary, and explicit written consent; otherwise the "paymaster" had no choice but to deliver the promised pay.

106.     Alston & Bird had no legal or lawful "obligation" to trespass upon, siphon and extort Plaintiff's private property for payment of a public debt.

107.     Alston & Bird's only obligation was to pay Alston & Bird's taxes as a registered corporation of the federal and State governments.

108.     At all material times, Plaintiff was a private employee who was under the assumption that she was employed by a private (non-governmental) entity.

109.     A private (non-governmental) is that which is not affiliated, through ownership or control, with federal, State and local governments. (Exhibits E and F)

110.     However, it is crystal clear that Alston & Bird is, in fact, a public (governmental) entity, performing public functions and enforcing public laws against a private individual, where no legal or lawful basis or authorization exists. (Exhibits G and H)

111.     Defendants willfully deprived and conspired to deprive Plaintiff of her federally protected right to labor and earnings derived from said labor, thereby subjecting Plaintiff to conditions of slavery, involuntary servitude and peonage for twelve (12) years.

15

**B.     The Conspiracy Fact**

112.     Defendants conspired to deprive Plaintiff of her federally protected rights the moment she shined a light on their egregious misconduct on April 17, 2019.

113.     From April 17, 2019, the Firm went to extraordinary lengths to prevent Plaintiff from breaking free from enslavement on the Alston & Bird plantation.

114.     Upon discovering Alston & Bird's wrongful taking of her private property for twelve (12) years, on or about April 17, 2019, Plaintiff initiated a conversation with payroll in an effort to remedy the Firm's egregious misconduct.

115.     On or about April 23, 2019, a futile email exchange ensued between Plaintiff and Nabors, wherein Plaintiff initially requested to alter Form W-4.

116.     On or about April 25, 2019, Nabors informed Plaintiff that she had done her "due diligence" and "'consulted with' four attorneys (Jake Kaplan, John Baron, Mark Williamson, and Blake MacKay) and the IRS" to make her determination.

117.     Plaintiff did not retain or engage Alston & Bird's services or complete a power of attorney for the Firm to represent her in private, commercial or legal affairs.

118.     The Firm's only duty, as Plaintiff's "private" employer, was to honor Form W-4 as filed; not to conduct "due diligence" about Plaintiff's requests or make any determinations on Plaintiff's behalf.

119.     These four Alston & Bird attorneys, one senior associate and three partners, (and Patton) are highly esteemed in their respective practices. The notion that they were not knowledgeable of the validity of Plaintiff's requests is utterly fanciful. (Exhibit I)

120.    Based on her "consultation", Nabors explained that, "[w]e are an employer that employs you as an employee. We do not employ the trust." [but] "[i]f we employ you as the Trust, we will need you to complete an I-9 with the new information."

121.    To be clear (or unclear), the Firm did not employ the Trust but if the Firm did employ Plaintiff as the Trust, it was as simple as Plaintiff completing a different form.

122.    The reality is, the Firm did employ "the Trust" – Plaintiff's C'est Tui Que Trust.

123.    Nabors also explained to Plaintiff that the "IRS had confirmed that this [Plaintiff's desire to withdraw the social security number assigned to her from the system] cannot be done unless (1) you go into witness protection program or (2) you die."

124.    Doing her own due diligence, Plaintiff conducted a simple Google search for "withdraw social security", which yielded the result of "Request for Withdrawal of Application" – Form SSA-521. Entering WITSEC or dying did not appear to be a prerequisite for processing the request.

125.    Nabors' "consultation" with a nameless, low-level IRS agent, who clearly had no idea what they were talking about, was ludicrous.

126.    According to the Social Security Administration, there is no law that requires Plaintiff to have a social security number to live or work in the United States.

127.    Plaintiff also discovered Form W-4T, which is a termination or withdrawal form that "releases the employer from any obligation to make payroll withholdings."

128.    Plaintiff quickly realized that her effort to remedy the Firm's egregious misconduct was deliberately being thwarted and the Firm was conspiring to keep her enslaved.

129.    On or about April 30, 2019, Plaintiff furnished Alston & Bird with a termination request citing the legal authority on which her request was based.

130.    Alston & Bird failed, refused or neglected to acknowledge the termination request via email or telephone communication and continued its wrongful taking of Plaintiff's private property after April 30, 2019.

131.    From November 15, 2007 through August 30, 2019, Alston & Bird trespassed upon, siphoned and extorted Plaintiff's private property under the false pretense that it had a withholding obligation related to Plaintiff's private property, where no legal or lawful basis or authorization exists.

132.    The Firm illegally and unlawfully deducted and withheld taxes from Plaintiff's retirement distribution, which she received on or about September 6, 2019.

133.    Defendants conspired to deprive Plaintiff of her federally protected right to labor and earnings from said labor, by disseminating disinformation and misinformation about the validity of her request to keep her enslaved on the Alston & Bird plantation, in violation of the 13th amendment.

134.    The 13th amendment prohibits slavery, involuntary servitude and peonage – declaring categorically, that they shall not exist in the United States, regardless of who or how the conditions are brought about.

135.    As a direct result of Alston & Bird's wrongful taking of Plaintiff's private property, Plaintiff (1) was forced into slavery, involuntary servitude and peonage for twelve (12) years; (2) lost more than a quarter of a million dollars in earnings; and (3) was compelled to labor involuntarily for four (4) months out of every year for twelve (12) years, for payment of a public debt, where no legal or lawful basis or authorization exists.

136.    Alston & Bird's wrongful taking severely injured and disrupted Plaintiff's quality of life, induced mental anguish and emotional distress, caused Plaintiff embarrassment, incited

stress-related physical disorders, impacted Plaintiff's financial and commercial ability, impaired Plaintiff's credit worthiness, inflamed familial issues, interfered with Plaintiff's social and recreational interactions and impeded Plaintiff's professional endeavors.

137.   These facts support Plaintiff's claim that Defendants deprived and conspired to deprive her of her federally protected rights guaranteed by the 1st and 13th Amendments to the Constitution under the protective mantle of 42 U.S.C. § 1983 of Title VII.

138.   WHEREFORE, Plaintiff has an action for the recovery of money damages, in commerce, occasioned by such violation of 42 U.S.C. § 1983 and prays for relief as set forth below.

**SECOND CAUSE OF ACTION**
**VIOLATION OF 42 U.S.C. § 1985(3)**
***Against All Defendants***

**I.**   **Defendants conspired to interfere with Plaintiff's federally protected rights guaranteed by the Fourteenth Amendment to the Constitution**

    **A.**   **Defendants conspired to interfere with Plaintiff's federally protected right to due process and equal protection of the laws**

139.   Plaintiff repeats, reiterates, re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

140.   In concerted action, as inferred by the sequence of events described in the preceding paragraphs, Alston & Bird, by and through its employees, including five attorneys, Kaplan, Baron, Williamson, MacKay, and Patton, its human resource senior management team, Benton and Stephens, and its payroll manager, Nabors, conspired to interfere with Plaintiff's right to due process and equal protection of the laws guaranteed by the 14th amendment to the Constitution, providing her with disinformation and misinformation to deter Plaintiff from exercising her federally protected rights.

141.     On or about April 30, 2019, after a futile email exchange with Nabors, Plaintiff submitted a termination request to the Firm to be effective immediately.

142.     Alston & Bird failed, refused or neglected to acknowledge the termination request via email or telephone communication and continued its wrongful taking of Plaintiff's private property after April 30, 2019.

143.     Plaintiff's termination request clearly cited the legal authority upon which her request was based.

144.     Nabors reports to Benton and Stephens. Although Nabors did not mention her "consultation" with Benton and Stephens in the emails, based on the summons received by Plaintiff from Stephens and the subsequent emails from Stephens and Benton, it is clear that Nabors conspired with Benton and Stephens to interfere with Plaintiff's federally protected right to equal protection of the laws.

145.     Defendants knowingly, willfully, intentionally and recklessly conspired to interfere with Plaintiff's right to equal protection of the laws by not "considering" and ignoring her termination request.

**B.      Defendants' conspiracy to interfere with Plaintiff's federally protected rights to due process and equal protection of the laws was racially motivated**

146.     Although the "black codes", which restrict and limit freedom and keep people in virtual bondage, were repealed, African-Americans employees continue to be denied opportunities and privileges that white employees enjoy.

147.     The Firm shows preferential treatment to white employee over African-American employees, as Plaintiff has experienced first-hand.

148.     Systemic racism and classism is alive and living in the culture of the Alston & Bird plantation.

20

149.     Defendants did not "consider" the validity of Plaintiff's request based on its perception of Plaintiff as an African-American woman, a "peon" on the Alston & Bird plantation, with a lack of credibility as a non-white, non-lawyer, who could not possibly have a grasp of what the law entails, absent the achievement of having attended law school and obtaining a law degree.

150.     The micro-aggressions weaved throughout the fabric of Defendants' briefings in a prior case, including, but limited to, its ascription of Plaintiff's intelligence with its comment about her lack of common sense, are an accurate reflection of the thought patterns of the privileged white masters that is commonplace on the Alston & Bird plantation.

151.     Plaintiff experienced racism first-hand at the Firm, as preferential treatment was shown to three of her white colleagues.

152.     Plaintiff is personally aware of an event where her white male colleague in the Real Estate Finance and Investment Group ("REFIG") refused to participate in one of the Firm's "mandatory" trainings because it was a violation of his privacy.

153.     The Firm made an exception to the rule and Plaintiff's white male colleague was not required to participate in the mandatory training.

154.     As SHRM certified professionals, Benton and Stephens are aware of the requirements of due process. In fact, Benton and Stephens overextended due process to another one of Plaintiff's white male colleagues in REFIG.

155.     For the five years Plaintiff worked with her white male colleague, his performance obligations were consistently problematic.

21

156.   Plaintiff was tasked with "covering" for her white male colleague on numerous occasions with no additional compensation or bonuses, while he continued to receive his full compensation and bonuses.

157.   Plaintiff was in constant contact with Vanessa Dobson, Human Resources Manager and Attorney Hiring Manager in the New York office ("Dobson") and Elizabeth Germain, Regional Director of Administration at the Firm, in person and via telephone and email communications, regarding this inequity, to no avail. The Firm failed, refused or neglected to remedy the situation.

158.   Upon his demise in February 2017, Plaintiff was tasked with "covering" the attorneys with whom her white male colleague was paired, with no additional compensation.

159.   Plaintiff was tasked with participating in the interview process to identify and select a replacement for her white male colleague, with no additional compensation.

160.   Toward the end of April 2017, REFIG was preparing to relocate from the 16th floor to the 13th floor. Plaintiff was tasked with (1) assisting the primary partner for whom her white male colleague worked pack her office for the move, (2) packing her own workspace, (3) clearing out her white male colleagues' workspace, including filing hundreds of documents, and (4) maintaining her own performance obligations, with no additional compensation.

161.   Plaintiff was also "tasked" with processing said primary partner's expenses, as her white male colleague had not submitted her expenses for almost one year, with no additional compensation.

162.   Defendants subjected Plaintiff to involuntary servitude under the optical illusion that Plaintiff was being a "team player," when, in fact, the Firm was getting "free labor" from Plaintiff doing double work with no additional compensation.

22

163.    About eight weeks later, Dobson summoned Plaintiff to "award" her a spot bonus of $750.00 for being such a "team player".

164.    To add insult to injury, Dobson informed Plaintiff that Benton and Stephens wanted to give her $250.00 asserting that Plaintiff had already been paid overtime for assuming the performance obligations of her, now deceased, white male colleague.

165.    Dobson, who was fully aware of the magnitude and intensity of the work Plaintiff had done, said she requested that Benton and Stephens "award" Plaintiff with the additional $500.00…tax-free.

166.    A $250.00 spot bonus is a bone you throw at a "peon" who should be grateful for the opportunity to work on the Alston & Bird plantation.

167.    While filing documents that her white male colleague failed to file since 2011, Plaintiff discovered that, due to the negligence of her white male colleague, his primary partner's New Jersey license was suspended. Once Plaintiff alerted human resources, the Firm quickly shelled out over $2,500.00 to have said partner's license reinstated.

168.    Plaintiff's quality of life was severely disrupted by this "mandatory" overtime. In May 2017, Plaintiff, who was relatively healthy, contracted streptococcal pharyngitis (strep throat) as a result of the excessive workload and working in the filthy, grungy workspace of her white male colleague.

169.    Before Plaintiff was diagnosed, she continued going to the office to perform her obligations but one day, she had to leave work early because of the excruciating pain.

170.    The Firm has a practice of paying additional compensation to Legal Administrative Assistants ("LAAs") who mentor new hires for three (3) months.

171.    For two (2) years and three (3) months, from April 2017 through June 2019, Plaintiff mentored her new colleague, the LAA who replaced her deceased white male colleague, with no additional compensation.

172.    Plaintiff is personally aware of two white colleagues who benefited from the Firm's practice, receiving additional compensation for mentoring new hires.

173.    One of Plaintiff's white female colleagues in REFIG was designated as "Lead Secretary", managing and monitoring workflow among five LAAs.   Plaintiff's colleague received additional compensation for these additional tasks.

174.    At the beginning of 2019, Dobson summoned Plaintiff and her white female colleague to her office to discuss Plaintiff's new assignment as "backup" on Mondays for her white female colleague, who worked a condensed workweek from Tuesday through Friday.

175.    Plaintiff also worked a condensed workweek from Monday through Thursday. No other LAA was assigned as her "backup" on Fridays.

176.    The Firm did not offer and Plaintiff did not receive any additional compensation for the additional task and once again, Alston & Bird received "free labor" from Plaintiff under the optical illusion that Plaintiff was being a "team player."

177.    These events, which are not isolated, are a demonstration of the racial bias that Plaintiff experienced first-hand at the Firm.

178.    Alston & Bird's refusal to make a reasonable accommodation of Plaintiff's reasonable requests was not solely on the basis of its validity or invalidity.

179.    Alston & Bird's decision to not "consider" Plaintiff's requests and treat Plaintiff with such disdain was purely and unequivocally on the basis of the systemic racism and classism that is consistent with and commonplace in the culture on the Alston & Bird plantation.

**C.     Defendants double down on the conspiracy to interfere with Plaintiff's federally protected rights to due process and equal protection of the laws**

180.    As SHRM certified professionals, Benton and Stephens had knowledge of the wrongs done against Plaintiff and the power to prevent or aid in preventing such wrongs.

181.    Benton and Stephens failed, neglected or refused to prevent or aid in preventing such wrongful conduct. Alternatively, Benton and Stephens facilitated the egregious misconduct.

182.    Alston & Bird, by and through it employees, Benton and Stephens resorted to doubling down on their commitment to further conspire to interfere with Plaintiff's federally protected rights to due process and equal protection of the laws by intimidation.

183.    Two weeks after Plaintiff submitted her termination request, on May 13, 2019, Plaintiff was summoned to attend a telephone conference with Stephens.

184.    During the telephone conference, Stephens reprimanded Plaintiff for exercising her federally protected rights and concluded the conversation by informing Plaintiff that if she did not like said final decision, she "should find someplace else to work."

185.    On May 14, 2019, Benton doubled down on Stephens' reprimand and Benton and Stephens decided to crack the whip and threaten Plaintiff's employment if she continued to exercise her federally protected rights to due process and equal protection of the laws.

186.    Benton and Stephens failed, refused or neglected to allow Plaintiff an opportunity to be heard. Instead, Benton and Stephens made a hasty and unsupported deprivation of Plaintiff's federally protected rights to due process and equal protection of the laws.

187.    Plaintiff's incessant inquisition for legal documentation for the Firm's blatant disregard and flagrant dismissiveness of Plaintiff's request to terminate its egregious misconduct fell on deaf ears as Hays, Benton and Stephens all failed, refused or neglected to provide Plaintiff with one single federal statutory authority to justify the Firm's egregious misconduct.

188.    Instead, Defendants chose to gaslight Plaintiff into believing that her request was incredible to keep her enslaved on the Alston & Bird plantation, when, in fact, they were all well aware of the validity of Plaintiff's request.

189.    Even if Defendants want to pretend they were not aware that Plaintiff's request was valid, (1) they were absolutely aware after reading Plaintiff's termination request and (2) "*Ignorantia juris non excusat*," especially in a law firm.

190.    Benton and Stephens conspired to interfere with Plaintiff's federally protected rights to due process and equal protection of the laws, jeopardizing Plaintiff's quality of living threatening to terminate her for exercising her, under the false pretense of adhering to the "Firm's tax withholding obligations", while failing to provide one single legal or lawful basis or authorization for the Firm's wrongful taking of Plaintiff's private property.

191.    These actions are consistent with the Firm's thought pattern regarding the "peons" who work on the Alston & Bird plantation; who are expected to do what they are told to do without question.

192.    Plaintiff was forced to resign on June 24, 2020 as a result of Defendants' conspiracy to interfere with Plaintiff's federally protected rights.

193.    On or about December 31, 2019, Plaintiff submitted a formal complaint to the EEOC about the Firm's unlawful, discriminatory employment practices.

194.    On or about May 29, 2020, Patton submitted the Firm's position statement, in which he stated, "[m]ore than six weeks went by without any further communication…about this tax withholding issue and the Firm assumed that the situation had been resolved…To be clear, [she] was never asked to resign and **she was not subjected to any disciplinary action** prior to the resignation of her employment." (Emphasis added.)

195.    To be clear, the threat of losing one's job and being unable to provide for one's family for choosing to exercise one's federally protected rights is the epitome of being subjected to disciplinary action.

196.    As a direct result of Alston & Bird's conspiracy to interfere with Plaintiff's federally protected rights to due process and equal protection of the laws, Plaintiff was forced to remain in slavery, involuntary servitude and peonage until she made the decision to break free and escape from the Alston & Bird plantation on July 4, 2019.

197.    Alston & Bird's conspiracy to interfere with Plaintiff's federally protected rights severely injured and disrupted Plaintiff's quality of life, induced mental anguish and emotional distress, caused Plaintiff embarrassment, incited stress-related physical disorders, impacted Plaintiff's financial and commercial ability, impaired Plaintiff's credit worthiness, inflamed familial issues, interfered with Plaintiff's social and recreational interactions and impeded Plaintiff's professional endeavors.

198.    These facts support Plaintiff's claim that Defendants conspired to interfere with Plaintiff's federally protected rights guaranteed by the 14th amendment to the Constitution under the protective mantle of 42 U.S.C. § 1985(3) of Title VII.

199.    WHEREFORE, Plaintiff has an action for the recovery of money damages, in commerce, occasioned by such violation of 42 U.S.C. § 1985(3) and prays for relief as set forth below.

### #

**THIRD CAUSE OF ACTION**
**VIOLATION OF 5 U.S.C. § 552A**
*Against Defendant Alston & Bird*

I.      **Defendants violated Plaintiff's federally protected rights guaranteed by the Privacy Act of 1974**

   A.     **Defendants failed to conform to the social security disclosure requirements of the Privacy Act**

200.    Plaintiff re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

201.    On November 12, 2007, Alston & Bird deceptively compelled Plaintiff to disclose and use the social security number assigned to her on voluntary forms under the false pretense that such disclosure and use of Plaintiff's private information was a mandatory requirement for her employment.

202.    Alston & Bird failed to conform to the social security disclosure requirements when (1) the Firm requested Plaintiff to disclose and use the social security number assigned to her, (2) the Firm failed to inform Plaintiff whether this disclosure was mandatory or voluntary, by what statutory authority or other authority the number was solicited and what uses would be made of it and (3) the Firm falsely represented its request as a mandatory requirement, where no legal or lawful basis or authorization exists.

203.    Alston & Bird cannot make something that is voluntary under federal law, mandatory under the "laws" of the Alston & Bird plantation.

   B.     **Defendants violated Plaintiff's right to privacy**

204.    Alston & Bird violated Plaintiff's right to privacy when (1) the Firm fraudulently filed information returns (i.e., W-2, 940, 941, 945) directly or indirectly relating to Plaintiff,

absent Form 2678 and (2) the Firm published, divulged, and disclosed Plaintiff's private and confidential statistical data, including amount and source of income, absent Form 8655.

205.     Plaintiff did not complete Form 2678 – the "Employer / Payer Appointment of Agent" form authorizing Alston & Bird to file information returns relating to Plaintiff to the Internal Revenue Service ("IRS").

206.     Plaintiff did not complete Form 8655 – the "Reporting Agent Authorization" form authorizing Alston & Bird to publish, divulge or disclose Plaintiff's private and confidential statistical data to the IRS.

207.     Alston & Bird had no legal or lawful basis or authorization to file information returns or to publish, divulge or disclose Plaintiff's private and confidential statistical data.

208.     As a direct result of Alston & Bird's failure to conform to the social security disclosure requirements – compelling the disclosure of the social security number assigned to her where no legal or lawful basis or authorization exists and violation of Plaintiff's right to privacy, Plaintiff (1) was forced into slavery, involuntary servitude and peonage for twelve (12) years, (2) lost over a quarter of a million dollars in compensation, and (3) was compelled to labor involuntarily for four (4) months out of every year for twelve (12) years, to pay off a public debt.

209.     Alston & Bird's violations severely injured and disrupted Plaintiff's quality of life, induced mental anguish and emotional distress, caused Plaintiff embarrassment, incited stress-related physical disorders, impacted Plaintiff's financial and commercial ability, impaired Plaintiff's credit worthiness, inflamed familial issues, interfered with Plaintiff's social and recreational interactions and impeded Plaintiff's professional endeavors.

210.    These facts support Plaintiff's claim that Alston & Bird failed to conform to the social security disclosure requirements and violated Plaintiff's federally protected right to privacy under the protective mantle of 5 U.S.C. § 552a.

211.    WHEREFORE, Plaintiff prays for declaratory relief and permanent injunction for such violation of the Privacy Act and prays for relief as set forth below.

## CONCLUSION

Alston & Bird is a public (governmental) entity, which is affiliated, through ownership or control, with federal, State and local governments.

Alston & Bird adamantly asserts that it is unequivocally a "private" entity, that law firms are not government entities and that it is preposterous to argue that Alston & Bird was converted into a government actor simply by complying with IRS rules and regulations and withholding payroll taxes from its employees.

Defendants continuously make reference to the Firm's withholding obligations under federal law, legal obligations under the IRS rules and regulations, fulfilling their obligations under federal law, and the Firm's policy of withholding taxes pursuant to federal law.

What Defendants fail to continuously make reference to, is the actual, factual federal law with which it is complying in its unequivocal capacity as a "private" entity, that authorized it to trespass upon, siphon and extort Plaintiff's private property for payment of a public debt for twelve (12) years.

Defendants' assertion that federal law applies only to government agencies and has no application to private employers or individual employees begs the question, under what federal law does Alston & Bird, a "private" employer, have withholding obligations for Plaintiff, an individual employee?

Defendants' choice to dig its heels in fabricated allegations about Plaintiff, ridiculing Plaintiff as having some imagined right to avoid payroll withholding by converting oneself into a so-called trust or other EIN entity, misconstruing the validity of Plaintiff's query as "nonsense", "groundless allegations" and "imaginative meanderings" and making the presumption that Plaintiff owed taxes on her wages, confirms Plaintiff's assertion that systemic racism was a motivating factor in the Firm's foundationless decision to knowingly, willfully, intentionally and recklessly deprive, conspire to deprive and conspire to interfere with Plaintiff's federally protected right to free exercise of religion, her right to labor and earning deprived from that labor and her right to due process and equal protection of the laws.

This dialect, which is indicative of the "slave master" mentality etched into and embedded in the egotistical minds of the white privileged, self-proclaimed, "upper echelon" on the Alston & Bird plantation, is generally reserved for "closed door conversations."

The Firm, in its smug "slave master" character felt emboldened to say that part out loud because of its irrational perception of Plaintiff as "The Help".

For the twelve (12) years Plaintiff was employed by Alston & Bird, she was, by the Firm's standards, a "Top Echelon" employee who consistently executed her performance obligations with excellence and integrity, as is proven in her employment records.

Alston & Bird's defamation of Plaintiff's character, while failing to establish any statutory authority on which to hang its hat, is egregious, repugnant and potentially actionable.

In the words of Prime Minister Margaret Thatcher, "If they attack one personally, it means they have not a single political [legal] argument left."

In the interest of judicial expediency, Defendants could have quite simply identified the federal or state law that authorized it to enforce public laws against a private individual.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court:

1.      Enter judgment in favor of Plaintiff and against Defendants on all causes of action in this Complaint;

2.      Declare, pursuant to 28 U.S.C. § 2201-2202, that the practices in this Complaint exist and are unlawful;

3.      Enter any and all declaratory relief and permanent injunction decrees necessary to effectively prevent all Defendants from engaging in similar unlawful violation of privacy and civil liberties in the future;

4.      Enter any and all declaratory relief and permanent injunction decrees necessary to effectively prevent all Defendants from engaging in similar false misrepresentation and fraudulent concealment of the true nature of the voluntary forms that causes the unknowing, unwilling, unintentional and involuntary waiver of federally protected rights of its future employees;

5.      Award Plaintiff the total amount of money that Alston & Bird illegally and unlawfully trespassed upon, siphoned and extorted from Plaintiff's private property, multiplied by seven (Proverbs 6:31);

5.      Award Plaintiff, in an amount to be proven at trial, compensatory damages, including loss of income and overtime pay (front and back pay with a 10% interest rate (pre- and post-judgment)) and other job benefits, including the value of health benefits, life insurance and other employee benefits, sufficient to redress all of the emotional and economic harms she has suffered;

32

6.    Award Plaintiff, in an amount to be proven at trial, punitive damages that would punish Defendants for their knowing, willful, intentional, voluntary and reckless disregard of clearly established federally protected constitutional and statutory rights, as alleged herein, sufficient to redress all of the emotional and economic harms she has suffered; and

7.    Award Plaintiff, in an amount to be proven at trial, such further relief deemed equitable and just, including reasonable fees, costs and expenses.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues so triable by a jury.

## CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that (1) the Complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a non-frivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after reasonable opportunity for further investigation or discovery; and (4) the Complaint otherwise complies with the requirements of Rule 11 of the Federal Rules of Civil Procedure.

Dated: October 18, 2021　　　　　　　　Respectfully submitted,
New York, New York　　　　　　　　　　Without Prejudice 1-308/1-207

　　　　　　　　　　　　　　　　By: _____
　　　　　　　　　　　　　　　　DAWN M. JOYNER, *Sui Juris*
　　　　　　　　　　　　　　　　c/o 343 Gold Street, Apt. 903
　　　　　　　　　　　　　　　　Brooklyn, New York near [11201]
　　　　　　　　　　　　　　　　dawn.joyner@me.com
　　　　　　　　　　　　　　　　All Rights Reserved.

33

# EXHIBIT A

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

Sue B. Wynn                    **Direct Dial: 404-881-7211**                    E-mail: sue.wynn@alston.com

October 1, 2007

Ms. Dawn Joyner
C/O Arnold & Porter
399 Park Avenue
New York, NY 10022

Dear Dawn:

On behalf of Alston & Bird, we are delighted that you have accepted our offer of employment, as a Legal Secretary in our Atlanta office beginning Monday, November 12, 2007. The purpose of this letter is to detail several matters relating to the Firm's offer.

- In your new position, you will report to Sue Wynn, the Secretarial Manager.

- You will be paid semi-monthly at a salary of $2,708.33 which is the equivalent to an annual amount of $65,000.

- This position is considered a non-exempt position for purposes of federal wage-hour law, which means you will be eligible for overtime pay for hours actually worked, in excess of 37.5 in a given workweek. You will receive a performance evaluation after three months. Thereafter, performance evaluations and salary increases are given annually in the month of your anniversary.

- You will earn 180 hours of Paid Time Off ("PTO") annually, which is prorated your first year. PTO hours are advanced on the 1st of the following month of employment and are prorated based on the number of full months remaining in the calendar year. Therefore you will be advanced 15 hours of PTO through (December) of (2007). In addition, you will be given two floating holidays to use at your discretion.

- As an Alston & Bird employee, you will be covered under group health and other insurance plans that are described in the enclosed summary. There is no waiting period for participation in our group medical insurance program. You will be eligible for medical, dental and vision coverage on your first day of employment.

One Atlantic Center • 1201 West Peachtree Street • Atlanta, GA 30309-3424 • 404-881-7000 • Fax: 404-881-7777
Bank of America Plaza • 101 South Tryon Street, Suite 4000 • Charlotte, NC 28280-4000 • 704-444-1000 • Fax: 704-444-1111
Chase Tower • 2200 Ross Avenue, Suite 4650 W • Dallas, TX 75201 • 214-432-7770 • 214-432-7771
90 Park Avenue • New York, NY 10016 • 212-210-9400 • Fax: 212-210-9444
3201 Beechleaf Court • Suite 600 • Raleigh, NC 27604-1062 • 919-862-2200 • Fax: 919-862-2260
The Atlantic Building • 950 F Street, NW • Washington, DC 20004-1404 • 202-756-3300 • Fax: 202-756-3333

Ms. Dawn Joyner
October 1, 2007
Page 2

- Your employment will be terminable at-will by either you or Alston & Bird.

Please report to the office on the 3rd Floor of the ACP building at 8:30 a.m. on November 12th to begin orientation. If you wish to park in the garage where the firm has allotted space, please bring a check in the amount of $95.00 to pay for the first month. Pre-tax payroll deductions of $95.00 will be taken from each paycheck thereafter to pay for future months. Also, be prepared to provide us with a copy of the following:

1. Driver's license and Social Security card; or
2. Driver's license and birth certificate; or
3. Passport.

If this letter accurately reflects your understanding of our offer of employment, please sign and return the copy to me. If you have any questions regarding any of the above items, don't hesitate to give me a call.

We are very excited about working with you at Alston & Bird and look forward to seeing you on your first day. Enclosed is a copy of our Confidentiality Agreement so that you can review it beforehand. We will provide you with another copy on your first day. If you have any questions, please do not hesitate to call me.

Truly yours,

Sue B. Wynn

Sue B. Wynn
HR Secretarial Manager

SBW:mj
Enclosures

Seen and accepted, this __10TH__ day of __OCTOBER__ , 2007

ADMIN/20113379v1

# EXHIBIT B

Personal and Confidential

# MEMORANDUM

TO:         Human Resources Payroll Department

FROM:       Dawn-Mignonne: Joyner

DATE:       April 30, 2019

RE:         Termination of Voluntary Withholding Agreement

The laws and regulations providing for the withholding of employment taxes are found in Title 26, Subtitle C, from Chapter 21 through Chapter 24. The legal provisions and definition of terms for the implementation of the Social Security program and the withholding of its tax are contained therein. In the Code of Federal Regulations at Section 31.3402, which corresponds to 26 USC 3402(p), it states in pertinent parts:

26 CFR 31.3402 (p)-1 Voluntary withholding agreements.

a) **Employer-employee agreement.** An employee and his employer may enter into an agreement under section 3402 (p)(3)(A) to provide for the withholding of income tax.

b) **Form and duration of employer-employee agreement.** (1)(i) Except as provided in subdivision (ii) of this subparagraph, an employee who desires to enter into an agreement under section 3402 (p)(3)(A) shall furnish his employer with Form W-4 (withholding exemption certificate) executed in accordance with the provisions of section 3402 (f) and the regulations thereunder. The furnishing of such Form W-4 shall constitute a request for withholding.

Furthermore, 26 CFR 31.3402 (p)-1(b)(2)states :

"An agreement under Section 3402(p)(3)(A) shall be effective for such period as the employer and the employee mutually agree upon. However, **either the employer or the employee may terminate the agreement prior to the end of such period by furnishing a signed written notice to the other.**" (emphasis added)

Additionally, Section 3401 clearly identifies who the "employees" are that are required to participate in Social Security.

§ 3401. Definitions

(c) Employee

For purposes of this chapter, the term "employee" includes an officer, employee or elected official of the United States, a State, or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any one or more of the foregoing. The term "employee" also includes an officer of a corporation.

I and most Americans are not the Federal employee compelled to participate; per the instructions provided by the aforementioned regulations. In addition, the Internal Revenue System has no

**Personal and Confidential**

**Termination of Voluntary Withholding Agreement**
April 30, 2019
Page 2

authority to assess an American with a Subtitle A through C income tax liability. Only the Citizen can assess himself with an income tax liability. That is why the U.S. Supreme Court said in the case of Flora v. U.S., 362 U.S. 145 that: "The system of taxation is based upon voluntary assessment and payment, not upon distraint."   Voluntary assessment means self-assessment in this case. I am neither a "citizen" nor a "resident" within the meaning of the Internal Revenue Code, because of my declared status as a Secured Party Creditor, a Private Citizen, who is not governed by any de facto corporation like the U.S. Corporation or its subsidiaries.

As such, this is my formal written notice to you desire that I wish to formally terminate between us any and all W-4 agreements on file with you, as per 26 CFR Sec. 31.3402 (p)-1(b)(2), effectively immediately.

Best regards,

*Dawn-Mignonne: Joyner*

Dawn-Mignonne: Joyner, trustee
DAWN MIGNONNE JOYNER TRUST

Alston & Bird LLP

# EXHIBIT C

# NOTICE AND DEMAND OF EXHIBITION OF EVIDENCE

## THIS IS A PRIVATE COMMUNICATION BETWEEN THE PARTIES

### NOTICE TO AGENT IS NOTICE TO PRINCIPAL
### NOTICE TO PRINCIPAL IS NOTICE TO AGENT
Applicable to all successors and assigns
*Silence is Acquiescence / Agreement / Dishonor*

November 12, 2020

™Dawn-Mignonne: Joyner©, Sui-Juris
c/o 343 Gold Street, Apartment 903
Brooklyn, New York near [11201]
Non-domestic without the United States

Via Email: richard.hays@alson.com
Via Certified Mail #: 7020 0640 0000 4702 8680
Richard R. Hays, Chairman/Managing Partner
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309-3424

Dear Mr. Hays,

On March 24, 2020, I filed a charge of constructive dismissal and discrimination against Alston & Bird ("the Firm") with the U.S. Equal Employment Opportunity Commission ("EEOC").

On September 2, 2020, the EEOC issued a Dismissal and Notice of Rights granting me the right to file a lawsuit against the Firm under federal law based on this charge.

This Notice and Demand of Exhibition of Evidence is my endeavor to resolve this issue expeditiously in a private capacity.

The crux of this charge emanates from the presumption made by the Firm, by and through its employees and agents, Cathy Benton, Chief Human Resources Officer, Michael Stephens, Director of Human Resources and Diversity, and Lynn Nabors, Payroll Manager, that my claim to assert my unalienable rights as a Secured Party Creditor was frivolous and invalid.

However, this charge of constructive dismissal and discrimination is less about my change of status to a Secured Party Creditor/Private Citizen and more about the Firm's infringement upon my constitutional rights and violation of my civil rights. It is more about the Firm impeding my ability to carry on my private business in my own way.

In my email communications with Human Resources, I repeatedly requested legal documentation that the Firm relied upon to support its decision to interfere with my contractual rights and deprive me of my rights secured or protected by the Constitution.

Although several tax and employee benefit attorneys at the Firm were consulted, no legal documentation supporting the Firm's position was ever produced or presented to me.

Instead the Firm chose to not operate in good faith, disseminate a myriad of fabricated misinformation and unsubstantiated responses, and threaten the security of my employment at the Firm should I pursue my claim.

Attempting to cause a person to do something by telling that person such action is required by law when it is not required by law may be a felony.

My request is legal and lawful and well within my constitutional rights. The Firm's actions are illegal and unlawful and violate the attorney oath to support and defend the Constitution of the United States.

Pursuant to Rule 8.4(a)(4) of the Georgia Rules of Professional Conduct: "It shall be a violation of the Georgia Rules of Professional Conduct for a lawyer to engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation."

Through this official Notice, I am, once again, requesting legal documentation the Firm relied upon to support its position.

The Firm's failure, refusal, or neglect to respond, rebut and/or contest the COMMERICAL AFFIDAVIT OF TRUTH annexed hereto and made part hereof by this reference within thirty (30) days from the date of this Notice on a point-by-point basis: 1) is your general acquiescence in this private matter; 2) shall be construed as a constructive silence; 3) shall be construed as concealment of incriminating evidence; 4) is your admission to the fact that all not provided information requested is not existent; 5) shall be construed as tortious interference; 6) shall create the legal presumption or conclusion that the Firm, by and through its employees and agents, has acted beyond the scope of its Charter and is involved in fraud and/or extortion; and 7) is fully binding upon you in any court in America, without your protest or objection or that of those who represent you.

This is a private communication and is intended to affect an out-of-court settlement of this instant matter.

I, ™Dawn-Mignonne: Joyner©, hereby and herein reserve the right, and am the only party with said right, to amend and or make amendments to this document as necessary, in order that the truth may be ascertained and its proceeding justly determined.

By: ™Dawn-Mignonne: Joyner©, Sui-Juris,
Without Prejudice UCC 1-308 [1-207]

2

A 'SECURITY' [15 USC et seq.]
U.S.S.E.C. TRACER FLAG
(not a point of law)

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss. |
| COUNTY OF KINGS | ) | |

## COMMERCIAL AFFIDAVIT OF TRUTH

### Important Notice

Receipt of this **COMMERCIAL AFFIDAVIT OF TRUTH** requires a response as stipulated. Acquiescence will be your answer to all below statements if the Firm fails, refuses or neglects to provide a written response in the form of a rebuttal Affidavit. Acquiescence means *"A person's tacit or passive acceptance; implied consent to an act."* Review Morris v. NCR, 44 SW2d 433, which states: *"An Affidavit if not contested in a timely manner is considered undisputed facts as a matter of law."* Also, review U.S. v. Pruden, 424 F.2d 1021 (1970), which states: *"Silence can only be equated with fraud where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading."*

### Introductory Certification

I, ™**Dawn-Mignonne: Joyner**©, a duly noted member of the Sovereign People of the Free Republic of New York, as sole authorized agent for the DEBTOR: **DAWN MIGNONNE JOYNER®™**, LEGAL TRUST ENTITY FOR USE IN COMMERCE #062-64-XXXX ("DEBTOR"), by Sovereign administrative judgment hereby serves your office with official notice of my lawful standing as A Sovereign Secured Party Creditor and Living Flesh and Blood, Non-Corporate, Natural, Indigenous Woman and Sentient Being. I have supreme authoritative power of attorney, sole security interest, and am the holder in due course of first right of claim over DEBTOR, evidenced by a 'Perfected' **$100,000,000.00** COMMERCIAL LIEN filed into the Public Record with the SECRETARY OF STATE. **I control all affairs of the DEBTOR, own all assets of the DEBTOR, and am exempt from levy ein#06264XXXX and relieved of all liability from the DEBTOR.**

I, ™**Dawn-Mignonne: Joyner**©, the Undersigned Affiant, hereinafter, "Affiant," does hereby solemnly swear, declare under penalty of perjury, and state as follows:

### Plain Statement of Facts

1.  THAT Affiant is competent to state the matters set forth herein.

2.  THAT Affiant has first-hand, personal knowledge of the facts stated herein.

3.  THAT all the facts stated herein are true, correct, complete and certain, admissible as evidence, and if called upon to testify as a witness, Affiant will testify to their veracity.

4.  THAT Affiant issues this Commercial Affidavit of Truth with sincere intent.

A 'SECURITY' [15 USC et seq.]
U.S.S.E.C. TRACER FLAG
(not a point of law)

### Specific Statement of Facts

5.   Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis for any withholding of income taxes from Affiant's personal earnings (not wages) during the entire tenure of Affiant's employment from November 12, 2007 to July 4, 2019 and believes that no such legal documentation exists; and,

6.   Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to deduct and withhold income taxes on personal earnings (not wages) from Affiant, who is neither an elected or appointed federal public official or contractor engaged in a privileged "trade or business" and believes that no such legal documentation exists; and,

7.   Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to coerce or compel Affiant through misrepresentation and concealment to authorize the Firm to withhold income taxes on Affiant's personal earnings (not wages) from labor and believes that no such legal documentation exists; and,

8.   Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to deduct and withhold income taxes on personal earnings (not wages) from labor under Affiant's social security number and believes that no such legal documentation exists; and,

9.   Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization by any government agency to make as a condition of employment the securing of private data and believes that no such legal documentation exists; and,

10.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to incorporate Form W-4 – Employee's Withholding Allowance Certificate, pursuant to 26 CFR § 31.3402(p)-1 a voluntary withholding agreement – as a condition of employment and believes that no such legal documentation exists; and,

11.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to enforce the use of Form W-4 as a condition of employment and believes that no such legal documentation exists; and,

12.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or

A 'SECURITY' [15 USC et seq.]
U.S.S.E.C. TRACER FLAG
(not a point of law)

lawful basis or authorization to disregard, dishonor and/or reject revisions made to Form W-4 by Affiant and believes that no such legal documentation exists; and,

13.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to assume responsibility or accountability for what the Firm deemed to be misstatements made by Affiant on Form W-4 and believes that no such legal documentation exists; and,

14.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to willfully ignore a signed written request by Affiant to terminate the voluntary withholding agreement, pursuant to 26 CFR § 31.3402(p)-1(b)(2) and believes that no such legal documentation exists; and,

15.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to supersede and supplant Affiant's contractual rights to fulfill "the Firm's tax withholding obligations" and believes that no such legal documentation exists; and,

16.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to enforce any tax withholding obligations within the Internal Revenue Code and believes that no such legal documentation exists; and,

17.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to contest, debate, investigate and/or oppose Affiant's decision to discontinue use of Affiant's social security number and believes that no such legal documentation exists; and,

18.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to violate Affiant's right to privacy pursuant to the Privacy Act of 1974 and believes that no such legal documentation exists; and

19.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to tortuously interfere with Affiant's contractual rights and believes that no such legal documentation exists; and,

20.  Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to threaten the security of Affiant's employment because of Affiant's decision to stand upon her constitutional rights to carry on her private business in her own way and believes that no such legal documentation exists; and,

A 'SECURITY' [15 USC et seq.]
**U.S.S.E.C. TRACER FLAG**
(not a point of law)

21.   Affiant has not seen or been presented with legal documentation that the Firm, as a private sector entity and self-proclaimed non-government contractor, had any legal or lawful basis or authorization to exceed the bounds of its authority and deprive Affiant of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States and believes that no such legal documentation exists.

### Verification

I affirm that all of the foregoing is true and correct. I affirm that I am of lawful age and am competent to make this Affidavit. I hereby affix my own autograph to all of the affirmations in this entire document with explicit reservation of all my unalienable rights and my specific common law right not to be bound by any contract or obligation which I have not entered into knowingly, willingly, voluntarily, and without misrepresentation, duress, or coercion.

The use of notary below is for identification only, and such use does NOT grant any jurisdiction to anyone.

**FURTHER AFFIANT SAITH NAUGHT.**

This **COMMERICAL AFFIDAVIT OF TRUTH** is dated the 12TH day of the November in the year of our Lord Two Thousand Twenty.

By: _____

™**Dawn-Mignonne: Joyner**©, Authorized Agent & Representative
for DAWN MIGNONNE JOYNER®™ *eng legis* and all derivatives thereof
All Rights Reserved Without Prejudice UCC 1-308 [1-207]

JURAT

STATE OF NEW YORK      )
                       )   ss.
COUNTY OF KINGS        )

Subscribed and sworn to (or affirmed) before me, _____, Notary Public, on this *13th* day of November, 2020 by ™**Dawn-Mignonne: Joyner**©, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

SAMUEL JOSEPH GARCIA
NOTARY PUBLIC-STATE OF NEW YORK
Registration No. 01GA6382579
Qualified in Kings County
Commision Exp October 29, 2022

_____
NOTARY PUBLIC

My commission Expires: _____10/29/2022_____

6

# EXHIBIT D



**Internal Revenue Service**
United States Department of the Treasury

**Part 5. Collecting Process**
**Chapter 14. Installment Agreements**
**Section 10. Payroll Deduction Agreements and Direct Debit Installment Agreements**

---

**5.14.10  Payroll Deduction Agreements and Direct Debit Installment Agreements**

- 5.14.10.1  Overview
- 5.14.10.2  Payroll Deduction Agreements
- 5.14.10.3  Preparation and Distribution of Form 2159, Payroll Deduction Agreement
- 5.14.10.4  Direct Debit Installment Agreements
- 5.14.10.5  Credit (and Debit) Card Payments by Individual Taxpayers
- Exhibit 5.14.10-1  Discontinue/Adjust Payroll Deduction
- Exhibit 5.14.10-2  Payroll Deduction Letter

**5.14.10.1  (09-30-2004)**
**Overview**

1. *This chapter provides procedures for processing Payroll Deduction agreements and Direct Debit installment agreements. Payroll deduction agreements are those agreements where employers deduct payments from taxpayer's wages, and mail them to the Internal Revenue Service. Direct Debit Agreements allow the Service to debit taxpayer's bank accounts. Payroll Deduction agreements and Direct Debit installment agreements benefit the taxpayer by reducing the likelihood of default and lessening taxpayer burden.*

**5.14.10.2  (09-30-2004)**
**Payroll Deduction Agreements**

1. The use of Form 2159, Payroll Deduction Agreement, must be strongly encouraged when the

2. Private employers, states, and political subdivisions are not required to enter into payroll deduction agreements. Taxpayers should determine whether their employers will accept and process executed agreements before agreements are submitted for approval or finalized.

   over the amount shown on payroll deduction agreements.

4. Allow a reasonable period for the employer to complete the necessary bookkeeping and submit the first payment.

5. On balance due and ACS accounts, encourage taxpayers to hand deliver agreements to employers; otherwise mail agreements to employers. If taxpayers prefer the Service initiate this contact, it may be made if the taxpayer received Letter 3164 A at least 10 days prior to mailing Form 2159 to the employer. Ensure Letter 12175 is completed and forwarded to the Third Party Contact Coordinator in the area or center initiating the contact. Letter 3164 A must have been mailed for each module included in the installment agreement. If Letter 3164 A has not been mailed, the taxpayer may authorize a specific third party contact if the revenue officer or other contact employee completes Form 12180 and has it signed by the taxpayer(s). This form should be kept with the case file and the case file history should be documented to reflect the date that the taxpayer provided the authorization. In processing Payroll Deduction Agreements ensure that all Third Party Contact guidelines have been observed. See IRM 5.1.17.

6. The employer and the taxpayer should sign Form 2159 before submission to the manager for approval.

7. On ACS accounts, direct employers responses to ACS call sites, document case files and forward them to call sites after completing telephone contact.

8. Ensure TC 971 AC 043 is input on all modules within 24 hours of the taxpayer's request for a payroll deduction agreement.

9. If employers must be contacted during Payroll Deduction Agreements, ensure Letter 3164 A was sent previously, and Form 12175 was completed and properly routed to the Third Party Contact coordinator. (See IRM 5.14.10.2(5).)

10. To insure proper remittance and posting, instruct employers, or request taxpayers advise their employers, to show taxpayers' names and TINs, tax form(s) and period(s) on all remittances.

11. If an employer requests formal notification from the Collection Field function that a Payroll Deduction Agreement is ended (because the liability is satisfied or for any other reason) Pattern Letter 2571C, Discontinue/Adjust Payroll Deduction, can be sent to the employer, selecting the appropriate paragraphs. (See Exhibit 5.14.10–1.) This letter may not be used to propose termination of agreements.

12. Use agreement locator number 1109, per Exhibit 5.14.1–2 on Payroll Deduction Agreements. Campus provides letters to employers for systemically monitored payroll deduction agreements based upon input of agreement locator number 1109.

### 5.14.10.3 (09-30-2004)
### Preparation and Distribution of Form 2159, Payroll Deduction Agreement

1. After securing taxpayer signatures on Form 2159, prepare Letter 2318C to mail or have the taxpayer deliver with Form 2159 to the employer. (See Exhibit 5.14.10–2.)

2. Input the correct address on Letter 2318C, and direct the employer to mail the entire completed Form 2159 to the originator, otherwise the form's instructions will direct the employer to mail only Part 1 back to the Campus.

3. Send or give to the taxpayer (to give or mail to the employer):

   A. Letter 2318C;

   B. Form 2159;

   C. a business reply envelope addressed to the revenue officer (or other contact employee) to return the signed Form 2159; and

   D. a business reply envelope addressed accordingly to be used to mail the first payment.

   **Note:**

   Notate the purpose on each envelope, so that Form 2159 is returned to the appropriate address.

   These may be mailed directly to employers if taxpayers received Letter 3164 A or it was sent at least ten days prior to mailing the Form 2159. (See IRM 5.14.10.2(5).) (Also, see IRM 5.14.10.3(8) for cases involving members of the Armed Forces overseas.) Since final payment dates and amounts cannot be definitely determined, write the total amount due (on bal dues included in agreements) on installment agreements forms (including accruals to the date agreements are prepared.)

4. Request taxpayers immediately notify their employers of payroll deduction requests and the purpose of the two envelopes.

5. After taxpayers and their employers have executed the Forms 2159 and returned them to appropriate contact employees, cases should be submitted for approval. (See IRM 5.14.9.2.)

6. After Form 2159 is approved, return the Employer's Copy to the taxpayer to give or mail to their employer, unless the taxpayer received Letter 3164 A or at least ten days since it was mailed to the taxpayer, in which case the Employer's copy of Form 2159 may be mailed directly to the employer. (See IRM 5.14.10.2(5).)

7. Also, furnish taxpayers with the Taxpayer's Copy of the assembly. A second Letter 2318C may accompany the taxpayer's copy, selecting the options regarding acceptance of the agreement (See Exhibit 5.14.10–2.). Note the balance due history that a payroll deduction agreement has been executed. Attach the approved Acknowledgment Copy to the balance due file and process the case appropriately.

8. If a payroll deduction agreement is made with a member of the Armed Forces overseas, forward the complete assembly to the taxpayer to give to his or her Commanding Officer (or mail it directly to the

Commanding Officer if Letter 3164 A was mailed at least 10 days earlier.) (See IRM 5.14.10.2(5).) In these cases, the Taxpayer's Copy of the assembly will be furnished to the taxpayer by the military establishment. Note the balance due history that a payroll deduction agreement has been executed. Upon receipt of the approved Acknowledgment Copy, attach to the balance due file and process the case appropriately.

**5.14.10.4  (09-30-2004)**
**Direct Debit Installment Agreements**

1. Direct debit installment agreements should be strongly encouraged when a payroll deduction agreement is not practical or appropriate, and especially encouraged if taxpayers defaulted on previous installment agreement(s).

2. The Direct Debit Installment Agreement (DDIA) system is a means by which funds are automatically debited from a taxpayer's checking account for the agreed upon installment amount. Some benefits of using direct debit installment agreements are:

    A. less chance of taxpayers forgetting to make their payment;

    B. less chance of a missed payment because the money was spent on other expenses;

    C. since no check is involved, there is no chance of it being lost, mishandled, misapplied, or being returned as incomplete or unsigned;

    D. IRS personnel will not have to manually post checks;

    E. "float" time associated with processing paper documents is eliminated; and

    F. the installment agreement default rate is reduced.

3. Electronic Funds Transfer (EFT) is sometimes used in place of DDIA, and for the purposes of this section has the same meaning. The Electronic Federal Tax Payment System (EFTPS) is used to pay by electronic funds transfer. See Publication 966, website www.eftps.gov or call 1-800-555-4477 or 1-800-945-8400 for more information.

4. Transit/ABA Number: This is a nine digit number usually located on the bottom left hand corner of a check. This number identifies the taxpayer's bank account in the Automatic Clearing House (ACH) system.

5. Instructions for direct debit installment agreements are on the back of the Taxpayer's Copy of Form 433–D, Installment Agreement. The taxpayer must sign the Form 433–D and initial the bottom of the form when this type of agreement is secured. A blank, voided check must be attached to the IRS Copy of Form 433–D.

6. After managerial approval (see IRM 5.14.9.2), forward the case-file to CSCO (formerly SCCB) for input and monitoring per IRM 5.14.9.5 and IRM 5.19.1.5.4.16.

**5.14.10.5  (09-30-2004)**
**Credit (and Debit) Card Payments by Individual Taxpayers**

1. Individual taxpayers may make payments — including installment agreement payments — with credit cards. Generally, payments can be made using an American Express Card, Discover Card, MasterCard or VISA card.

    - installment agreement payments can be made for the current tax year and for taxes that are up to three tax years past due.

    - For Filing Season 2004, Tax Year 2000 - 2003 installment agreement payments will be accepted through midnight, January 31, 2005.

    - An installment agreement payment can be made for the full outstanding balance or a partial or monthly payment can be made and applied to the outstanding balance.

2. Taxpayers may use credit cards to make installment agreement payments to the United States Treasury by by phone or internet. Both of these payment methods include user-friendly prompts and menus. Two credit card service providers offer these options to individual taxpayers 24 hours a day, 7 days a week. Payments can be made using a Discover Card, MasterCard or VISA card.

3. A convenience fee, based on the payment amount, is charged by the service provider. Full fee information is available from the service provider.

4. The service provider, Official Payments Corporation, offers the following services:

   A. To pay by phone, taxpayers can call 1-800-2PAY-TAX (1-800-272-9829), toll free.

   B. To pay by Internet, taxpayers can visit http://www.officialpayments.com.

   C. For additional information or customer service, taxpayers can call 1-877-754-4413, toll free.

   D. d. To make a payment of $100,000 or higher, taxpayers can call 1-877-754-4420, toll free.

5. The service provider, Link2Gov, offers the following services:

   A. To pay by phone, taxpayers can call 1-888-PAY-1040 (1-888-729-1040), toll free.

   B. To pay by Internet, taxpayers can visit http://www.pay1040.com.

   C. For additional information or customer service, taxpayers can call the service provider at 1-888-658-5465, toll free.

   D. To make a payment of any amount including equaling $100,000 or more, taxpayers can call 1-888-PAY-1040 (1-888-729-1040), toll free.

6. To use one of these payment methods, taxpayers should be prepared to provide:

   A. social security number;

   B. full name and address (internet only);

   C. tax period for which tax is owed;

   D. amount of the payment;

   E. credit card number ; and,

   F. credit card expiration date.

7. Two installment agreement payments can be made by credit card per month.

8. Taxpayers can use debit cards issued by VISA and MasterCard when making tax payments through the two participating service providers. However, the service providers, VISA and MasterCard treat debit cards and credit cards equally for the purpose of processing electronic tax payments. Thus, debit card users are charged the same fee traditionally associated with credit card transactions.

9. If taxpayers, representatives or employees have questions about making payments utilizing the two credit card payment service providers, they may contact the customer service numbers listed above or IRS Customer Service.

**Exhibit 5.14.10-1  (03-30-2002)**
**Discontinue/Adjust Payroll Deduction**

This image is too large to be displayed in the current screen. Please click the link to view the image.

**Exhibit 5.14.10-2  (03-30-2002)**
**Payroll Deduction Letter**

This image is too large to be displayed in the current screen. Please click the link to view the image.

More Internal Revenue Manual

# EXHIBIT E

# Withholding tax requirements

## Who must withhold personal income tax

If you are an employer as described in federal <u>Publication 15, Circular E</u>, *Employer's Tax Guide,* and you maintain an office or transact business within New York State, whether or not a paying agency is maintained within the state, you must withhold personal income tax.

- Out-of-state employers who are not incorporated or licensed under New York State law and do not maintain an office or transact business in New York State are not required to withhold New York State, New York City, or Yonkers income taxes

- If an out-of-state employer agrees to withhold New York State, New York City, or Yonkers income taxes for the convenience of the employee, then the employer is subject to New York State withholding requirements.

## Who you must withhold tax for

- New York State residents earning wages even when earned outside of the state
- New York State nonresidents being paid wages for services performed within the state
- New York City residents even when services are performed outside New York City
- Yonkers residents even when services are performed outside Yonkers
- Yonkers nonresidents on wages paid for services performed in Yonkers

**Note:** Employees who claim they are not a resident of New York State, New York City, or Yonkers must certify they are not a resident and estimate the percentage of their wages and other compensation attributable to services in New York State or Yonkers. See <u>Form IT-2104.1</u>, *New York State, City of New York, and City of Yonkers Certificate of Nonresidence and Allocation of Withholding Tax.*

10/13/21, 8:55 AM

# EXHIBIT F



Department of the Treasury
**Internal Revenue Service**

**Publication 15**
Cat. No. 10000W

# (Circular E), Employer's Tax Guide

For use in **2021**

Get forms and other information faster and easier at:
- *IRS.gov* (English)
- *IRS.gov/Korean* (한국어)
- *IRS.gov/Spanish* (Español)
- *IRS.gov/Russian* (Русский)
- *IRS.gov/Chinese* (中文)
- *IRS.gov/Vietnamese* (TiếngViệt)

Feb 04, 2021

# Contents

What's New . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Reminders . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Calendar . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1. Employer Identification Number (EIN) . . . . . . . 12

2. Who Are Employees? . . . . . . . . . . . . . . . . . 12

3. Family Employees . . . . . . . . . . . . . . . . . . . 14

4. Employee's Social Security Number (SSN) . . . 15

5. Wages and Other Compensation . . . . . . . . . . 16

6. Tips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

7. Supplemental Wages . . . . . . . . . . . . . . . . . . 20

8. Payroll Period . . . . . . . . . . . . . . . . . . . . . . 21

9. Withholding From Employees' Wages . . . . . . . 22

10. Required Notice to Employees About the
     Earned Income Credit (EIC) . . . . . . . . . . . . . 27

11. Depositing Taxes . . . . . . . . . . . . . . . . . . . . 27

12. Filing Form 941 or Form 944 . . . . . . . . . . . . 33

13. Reporting Adjustments to Form 941 or
     Form 944 . . . . . . . . . . . . . . . . . . . . . . . . 35

14. Federal Unemployment (FUTA) Tax . . . . . . . . 38

15. Special Rules for Various Types of
     Services and Payments . . . . . . . . . . . . . . . . 41

16. Third-Party Payer Arrangements . . . . . . . . . . 46

How To Get Tax Help . . . . . . . . . . . . . . . . . . . . 47

Index . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# Future Developments

For the latest information about developments related to Pub. 15, such as legislation enacted after it was published, go to *IRS.gov/Pub15*.

At the time this publication went to print, Congress was considering changes to coronavirus (COVID-19) tax relief. If new legislation impacts this publication, updates will be posted to *IRS.gov/Pub15*. You may also go to *IRS.gov/Coronavirus* for the latest information about COVID-19 tax relief. Also check for recent developments that impact your employment tax return by going to the *Recent Developments* section on *IRS.gov/Form941* or *IRS.gov/Form944*.

*by December 31, 2022. Any payments or deposits you make before December 31, 2021, are first applied against your payment due on December 31, 2021, and then applied against your payment due on December 31, 2022. If you deferred the employee share of social security taxes under Notice 2020-65, you must withhold and pay the deferred taxes ratably from wages paid between January 1, 2021, and December 31, 2021. Because both December 31, 2021, and December 31, 2022, are nonbusiness days, payments made on the next business day will be considered timely. For more information and payment instructions, see the Instructions for Form 941, or the Instructions for Form 944, IRS.gov/ETD, Notice 2020-65, and Notice 2021-11. For information about how to report the deferred amount of the employee share of social security tax on Form W-2 and Form W-2c for 2020, see IRS.gov/FormW2 and the 2021 General Instructions for Forms W-2 and W-3 (available in early 2021).*

# Introduction

This publication explains your tax responsibilities as an employer. It explains the requirements for withholding, depositing, reporting, paying, and correcting employment taxes. It explains the forms you must give to your employees, those your employees must give to you, and those you must send to the IRS and the SSA. References to "income tax" in this guide apply only to "federal" income tax. Contact your state or local tax department to determine their rules.

When you pay your employees, you don't pay them all the money they earned. As their employer, you have the added responsibility of withholding taxes from their paychecks. The federal income tax and employees' share of social security and Medicare taxes that you withhold from your employees' paychecks are part of their wages that you pay to the U.S. Treasury instead of to your employees. Your employees trust that you pay the withheld taxes to the U.S. Treasury by making federal tax deposits. This is the reason that these withheld taxes are called trust fund taxes. If federal income, social security, or Medicare taxes that must be withheld aren't withheld or aren't deposited or paid to the U.S. Treasury, the trust fund recovery penalty may apply. See section 11 for more information.

Additional employment tax information is available in Pubs. 15-A, 15-B, and 15-T. Pub. 15-A includes specialized information supplementing the basic employment tax information provided in this publication. Pub. 15-B, Employer's Tax Guide to Fringe Benefits, contains information about the employment tax treatment and valuation of various types of noncash compensation. Pub. 15-T includes the federal income tax withholding tables and instructions on how to use the tables.

Most employers must withhold (except FUTA), deposit, report, and pay the following employment taxes.

- Income tax.
- Social security tax.
- Medicare tax.
- FUTA tax.

There are exceptions to these requirements. See section 15 for guidance. Railroad retirement taxes are explained in the Instructions for Form CT-1. Employment taxes for agricultural employers are explained in Pub. 51. If you have employees in the U.S. Virgin Islands, Guam, American Samoa, or the Commonwealth of the Northern Mariana Islands, see Pub. 80.

**Comments and suggestions.** We welcome your comments about this publication and your suggestions for future editions.

You can send us comments through IRS.gov/FormComments.

Or you can write to:

Internal Revenue Service
Tax Forms and Publications
1111 Constitution Ave. NW, IR-6526
Washington, DC 20224

Although we can't respond individually to each comment received, we do appreciate your feedback and will consider your comments as we revise our tax forms, instructions, and publications. Do **not** send tax questions, tax returns, or payments to this address.

***Getting answers to your tax questions.*** If you have a tax question not answered by this publication, check IRS.gov and How To Get Tax Help at the end of this publi-

**Federal government employers.** The information in this publication, including the rules for making federal tax deposits, applies to federal agencies.

employees for services in the employ of state and local government employers are generally subject to federal income tax withholding but not FUTA tax. Most elected and appointed public officials of state or local governments are employees under common law rules. See chapter 3 of Pub. 963, Federal-State Reference Guide. In addition, wages, with certain exceptions, are subject to social security and Medicare taxes. See section 15 for more information on the exceptions.

If an election worker is employed in another capacity with the same government entity, see Revenue Ruling 2000-6 on page 512 of Internal Revenue Bulletin 2000-6 at IRS.gov/pub/irs-irbs/irb00-06.pdf.

You can get information on reporting and social security coverage from your local IRS office. If you have any questions about coverage under a section 218 (Social Security Act) agreement, contact the appropriate state official. To find your State Social Security Administrator, visit the National Conference of State Social Security Administrators website at NCSSSA.org.

**Indian tribal governments.** See Pub. 4268 for employment tax information for Indian tribal governments.

# EXHIBIT G



Department
of the
Treasury

**Internal
Revenue
Service**

**Publication 515**
Cat. No. 15019L

# Withholding of Tax on Nonresident Aliens and Foreign Entities

For use in **2021**

## Contents

What's New . . . . . . . . . . . . . . . 1

Reminders . . . . . . . . . . . . . . . . 2

Introduction . . . . . . . . . . . . . . . 2

Withholding of Tax . . . . . . . . . . . 3

Persons Subject to Chapter 3 or
    Chapter 4 Withholding . . . . . . . . . 5

Documentation . . . . . . . . . . . . . 10

Income Subject to Withholding . . . . . 23

Withholding on Specific Income . . . . . 26

Foreign Governments and Certain
    Other Foreign Organizations . . . . 39

U.S. or Foreign TINs . . . . . . . . . . . 40

Depositing Withheld Taxes . . . . . . . . 41

Returns Required . . . . . . . . . . . . . 42

Partnership Withholding on
    Effectively Connected Income . . . 43

Section 1446(f) Withholding . . . . . . . 46

U.S. Real Property Interest . . . . . . . . 48

Definitions . . . . . . . . . . . . . . . . 51

Tax Treaties . . . . . . . . . . . . . . . 52

How To Get Tax Help . . . . . . . . . . . 52

Index . . . . . . . . . . . . . . . . . . 55

## Future Developments

For the latest information about developments related to Pub. 515, such as legislation enacted after it was published, go to *IRS.gov/Pub515*.

## What's New

**New requirement to fax requests for extension to furnish statements to recipients.** Requests for an extension of time to furnish certain statements to recipients, including Form 1042-S, should now be faxed to the IRS. For more information see *Extension to furnish statements to recipients* under *Extensions of Time To File*, later.

**COVID-19 relief for Form 8233 filers.** The IRS has provided relief from withholding on compensation for certain dependent personal services, for individuals who were unable to leave the United States due to the global health emergency caused by COVID-19. For more information, see the *Instructions for Form 8233* revised November 2020.



**Get forms and other information faster and easier at:**
- *IRS.gov* (English)
- *IRS.gov/Spanish* (Español)
- *IRS.gov/Chinese* (中文)
- *IRS.gov/Korean* (한국어)
- *IRS.gov/Russian* (Pусский)
- *IRS.gov/Vietnamese* (TiếngViệt)

❏ **W-8BEN** Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding and Reporting (Individuals)

❏ **W-8BEN-E** Certificate of Status of Beneficial Owner for United States Tax Withholding and Reporting (Entities)

❏ **W-8ECI** Certificate of Foreign Person's Claim That Income Is Effectively Connected With the Conduct of a Trade or Business in the United States

❏ **W-8EXP** Certificate of Foreign Government or Other Foreign Organization for United States Tax Withholding and Reporting

❏ **W-8IMY** Certificate of Foreign Intermediary, Foreign Flow-Through Entity, or Certain U.S. Branches for United States Tax Withholding and Reporting

❏ **W-8 Inst.** Instructions for the Requester of Forms W-8BEN, W-8BEN-E, W-8ECI, W-8EXP, and W-8IMY

❏ **W-9** Request for Taxpayer Identification Number and Certification

❏ **W-9 Inst.** Instructions for the Requester of Form W-9

❏ **941** Employer's QUARTERLY Federal Tax Return

❏ **945** Annual Return of Withheld Federal Income Tax

❏ **1042** Annual Withholding Tax Return for U.S. Source Income of Foreign Persons

❏ **1042-S** Foreign Person's U.S. Source Income Subject to Withholding

❏ **1042-T** Annual Summary and Transmittal of Forms 1042-S

❏ **13930** Instructions on how to apply for a Central Withholding Agreement

❏ **13930-A** Application for Central Withholding Agreement Less than $10,000

❏ **8233** Exemption From Withholding on Compensation for Independent (and Certain Dependent) Personal Services of a Nonresident Alien Individual

❏ **8288** U.S. Withholding Tax Return for Disposition by Foreign Persons of U.S. Real Property Interests

❏ **8288-A** Statement of Withholding on Dispositions by Foreign Persons of U.S. Real Property Interests

❏ **8288-B** Application for Withholding Certificate for Dispositions by Foreign Persons of U.S. Real Property Interests

❏ **8966** FATCA Report

See *How To Get Tax Help* at the end of this publication for information about getting publications and forms.

# Withholding of Tax

In most cases, a foreign person is subject to U.S. tax on its U.S. source income. Most types of U.S. source income received by a foreign person are subject to U.S. tax of 30%. A reduced rate, including exemption, may apply if there is a tax treaty between the foreign person's country of residence and the United States. The tax is generally withheld (chapter 3 withholding) from the payment made to the foreign person.

The term "chapter 3 withholding" is used in this publication descriptively to refer to withholding required under sections 1441, 1442, and 1443 of the Internal Revenue Code. In most cases, chapter 3 withholding describes the withholding regime that requires withholding on a payment of U.S. source income. Payments to foreign persons, including nonresident alien individuals, foreign entities, and governments, may be subject to chapter 3 withholding.

Withholding may also be required on a payment to the extent required under chapter 4. "chapter 4" refers to chapter 4 of Subtitle A (sections 1471 through 1474 of the Internal Revenue Code). See *Chapter 4 Withholding Requirements*, later.

 Chapter 3 withholding does not include withholding under section 1445 of the Internal Revenue Code (see U.S. Real Property Interest, later) or under section 1446 of the Internal Revenue Code (see Partnership Withholding on Effectively Connected Income and Section 1446(f) Withholding, later).

A withholding agent (defined next) is the person responsible for withholding on payments made to a foreign person. However, a withholding agent that can reliably associate the payment with *documentation* (discussed later) from a U.S. person is not required to withhold. In addition, a withholding agent may apply a reduced rate of withholding (including an exemption from withholding) if it can reliably associate the payment with documentation from a beneficial owner that is a foreign person entitled to a reduced rate of withholding.

If an amount subject to chapter 3 withholding is also a *withholdable payment* and chapter 4 withholding is applied to the payment, no withholding is required under chapter 3. See

## Withholding Agent

### Chapter 3 Withholding Requirements

You are a withholding agent if you are a U.S. or foreign person, in whatever capacity acting, that has control, receipt, custody, disposal, or payment of an amount subject to chapter 3 withholding. A withholding agent may be an individual, corporation, partnership, trust, association, nominee (under section 1446 of the Internal Revenue Code), or any other entity, including any foreign intermediary, foreign partnership, or U.S. branch of certain foreign banks and

insurance companies. You may be a withholding agent even if there is no requirement to withhold from a payment or even if another person has withheld the required amount from the payment.

Although several persons may be withholding agents for a single payment, the full tax is required to be withheld only once. In most cases, the U.S. person who pays an amount subject to chapter 3 withholding is the person responsible for withholding. However, other persons may be required to withhold. For example, a payment made by a flow-through entity or nonqualified intermediary (NQI) that knows, or has reason to know, that the full amount of chapter 3 withholding was not done by the person from which it receives a payment is required to do the appropriate withholding since it also falls within the definition of a withholding agent. In addition, withholding must be done by any QI, withholding foreign partnership, or withholding foreign trust in accordance with the terms of its withholding agreement, discussed later.

**Liability for tax.** As a withholding agent, you are personally liable for any tax required to be withheld. This liability is independent of the tax liability of the foreign person to whom the payment is made. If you fail to withhold and the foreign payee fails to satisfy its U.S. tax liability, then both you and the foreign person are liable for tax, as well as interest and any applicable penalties.

The applicable tax will be collected only once. If the foreign person satisfies its U.S. tax liability, you are not liable for the tax but remain liable for any interest and penalties for failure to withhold.

**Determination of amount to withhold.** You must withhold on the gross amount subject to chapter 3 withholding. You cannot reduce the gross amount by any deductions.

If the determination of the source of the income or the amount subject to tax depends on facts that are not known at the time of payment, you must withhold an amount sufficient to ensure that at least 30% of the amount subsequently determined to be subject to withholding is withheld. In no case, however, should you withhold more than 30% of the total amount paid. You may elect to hold 30% of the payment in escrow until the earlier of the date that the amount of income from U.S. sources or the taxable amount can be determined or 1 year from the date the amount is placed in escrow, at which time the withholding becomes due, or, to the extent that withholding is not required, the escrowed amount must be paid to the payee.

**When to withhold.** Withholding is required at the time you make a payment of an amount subject to withholding. A payment is made to a person if that person realizes income, whether or not there is an actual transfer of cash or other property. A payment is considered made to a person if it is paid for that person's benefit. For example, a payment made to a creditor of a person in satisfaction of that person's debt to the creditor is considered made to the person. A payment also is considered made to a person if payment is made to that person's agent.

A U.S. partnership should withhold when any distributions that include amounts subject to withholding are made. However, if a foreign partner's distributive share of income subject to withholding is not actually distributed, the U.S. partnership must withhold on the foreign partner's distributive share of the income on the earlier of the date that a Schedule K-1 (Form 1065) is furnished or mailed to the partner or the due date for furnishing that schedule. If the distributable amount consists of effectively connected income, see *Partnership Withholding on Effectively Connected Income*, later.

A U.S. trust is required to withhold on the amount includible in the gross income of a foreign beneficiary to the extent the trust's distributable net income consists of an amount subject to withholding. To the extent a U.S. trust is required to distribute an amount subject to withholding but does not actually distribute the amount, it must withhold on the foreign beneficiary's allocable share at the time the income is required to be reported on Form 1042-S.

## Chapter 4
## Withholding Requirements

You are a withholding agent for purposes of chapter 4 if you are a U.S. or foreign person, in whatever capacity you are acting, that has control, receipt, custody, disposal, or payment of a withholdable payment. Similar rules for determining who is a withholding agent as those described in *Chapter 3 Withholding Requirements*, earlier, also apply for chapter 4. For purposes of chapter 4, a withholding agent includes a participating foreign financial institution (FFI) (including a reporting Model 2 FFI) or registered deemed-compliant FFI to the extent such FFI makes a withholdable payment.

Under chapter 4 of the Internal Revenue Code, a withholding agent that makes a withholdable payment to a payee that is an FFI must withhold 30% on the payment unless the withholding agent is able to treat the FFI as a *participating FFI*, *deemed-compliant FFI*, or *exempt beneficial owner*. A withholding agent must also withhold 30% on a withholdable payment made to a payee that is a foreign entity other than an FFI (that is, a nonfinancial foreign entity, or NFFE) that fails to identify its substantial U.S. owners (or certify that it does not have any substantial U.S. owners) unless the payment is excepted from withholding under the regulations to section 1472 of the Internal Revenue Code. A participating FFI is a withholding agent under chapter 4 and is required to withhold on a withholdable payment to the extent required under the FFI agreement, including on a payment made to an account holder that the FFI is required to treat as a recalcitrant account holder. A reporting Model 1 FFI is required to withhold under chapter 4 to the extent required in the applicable Intergovernmental Agreement (IGA). A registered deemed-compliant FFI (other than a reporting Model 1 FFI) is required to withhold under chapter 4 to the extent required under the conditions applicable to its registered deemed-compliant FFI status. See Regulations section 1.1471-5(f)(1) for a description of the types of registered deemed-compliant FFIs that may have withholding requirements.

Generally, a withholdable payment is a payment of U.S. source fixed or determinable annual or periodical (FDAP) income. Specific exceptions to withholdable payments apply instead of the exemptions from withholding or taxation provided under chapter 3. See *Income Subject to Withholding*, later, for more information on payments of U.S. source FDAP income that are excepted from the definition of withholdable payment.

If a withholding agent makes a payment subject to both chapter 4 withholding and chapter 3 withholding, the withholding agent must apply the withholding provisions of chapter 4, and need not withhold on the payment under chapter 3 to the extent that it has withheld under chapter 4.

Similar rules for withholding agent liability for tax, determination of amount to withhold, and when to withhold as those described in *Chapter 3 Withholding Requirements*, earlier, also apply for chapter 4.

## Forms 1042 and 1042-S Reporting Obligations

You are required to report payments subject to chapter 3 withholding on Form 1042-S and to file a tax return on Form 1042. (See *Returns Required*, later.) You also are required to report withholdable payments to which chapter 4 withholding was (or should have been) applied on Form 1042-S and to file a tax return on Form 1042 to report the payments. An exception for reporting may apply for chapter 3 purposes to individuals who are not required to withhold from a payment and who do not make the payment in the course of their trade or business. A similar exception from reporting for chapter 4 purposes may apply to an individual making a withholdable payment outside the course of the individual's trade or business (including as an agent with respect to making or receiving such payment).

## Withholding and Reporting Obligations (Other Than Forms 1042 and 1042-S Reporting)

**Form 1099 reporting and backup withholding.** You may also be responsible as a payer for reporting payments to a U.S. person, generally on Form 1099. You must withhold 24% (backup withholding rate) from certain reportable payments made to a U.S. person that is subject to Form 1099 reporting if any of the following apply.

- The U.S. person has not provided its taxpayer identification number (TIN) in the manner required.
- The IRS notifies you that the TIN furnished by the payee is incorrect.
- There has been a notified payee underreporting.
- There has been a payee certification failure.

In most cases, a TIN must be provided by a U.S. nonexempt recipient (a U.S. person subject to Form 1099 reporting) on Form W-9.

A payer files a tax return on Form 945 to report backup withholding.

You may be required to file Form 1099 and, if appropriate, backup withhold, even if you do not make the payments directly to that U.S. person. For example, you are required to report income paid to a foreign intermediary or flow-through entity that collects for a U.S. person subject to Form 1099 reporting. However, you may not be required to report on Form 1099 if you make a payment to a participating FFI or registered deemed-compliant FFI that provides a withholding statement allocating the payment to a chapter 4 withholding rate pool of U.S. payees. See *Identifying the Payee*, later, for more information. Also see *Section S. Special Rules for Reporting Payments Made Through Foreign Intermediaries and Foreign Flow-Through Entities on Form 1099* in the General Instructions for Certain Information Returns.

 *Foreign persons who provide a Form W-8 (or applicable documentary evidence when permitted in lieu of a Form W-8) are exempt from backup withholding and Form 1099 reporting.*

**Form 8966 reporting.** For chapter 4 purposes, you may be required to report on Form 8966, FATCA Report, if you make a withholdable payment to an entity you agree to treat as an owner-documented FFI or to a passive NFFE. See *Returns Required*, later.

**Wages paid to employees.** If you are the employer of a nonresident alien, you must generally withhold taxes at graduated rates. See *Pay for Personal Services Performed*, later.

**Effectively connected income by partnerships.** A withholding agent that is a partnership (whether U.S. or foreign) is also responsible for withholding on its income effectively connected with a U.S. trade or business that is allocable to foreign partners. See *Partnership Withholding on Effectively Connected Income*, later, for more information.

**Transfers of interests in partnerships engaged in the conduct of a U.S. trade or business.** A withholding agent is also responsible for withholding on the transfer by a foreign partner of an interest in a partnership (domestic or foreign) engaged in the conduct of a U.S. trade or business. See *Section 1446(f) Withholding*, later, in this publication for more information.

**U.S. real property interest.** A withholding agent may also be responsible for withholding if a foreign person transfers a U.S. real property interest to the agent, or if it is a corporation, partnership, trust, or estate that distributes a U.S. real property interest to a shareholder, partner, or beneficiary that is a foreign person. See *U.S. Real Property Interest*, later.

# EXHIBIT H

# BLACK'S
# LAW DICTIONARY®

Definitions of the Terms and Phrases of
American and English Jurisprudence,
Ancient and Modern

By

HENRY CAMPBELL BLACK, M. A.

## SIXTH EDITION
### BY
### THE PUBLISHER'S EDITORIAL STAFF

Coauthors

**JOSEPH R. NOLAN**

Associate Justice, Massachusetts Supreme Judicial Court

and

**JACQUELINE M. NOLAN–HALEY**

Associate Clinical Professor,
Fordham University School of Law

———

Contributing Authors

**M. J. CONNOLLY**
Associate Professor (Linguistics),
College of Arts & Sciences, Boston College

**STEPHEN C. HICKS**
Professor of Law, Suffolk University
Law School, Boston, MA

**MARTINA N. ALIBRANDI**
Certified Public Accountant, Bolton, MA

ST. PAUL, MINN.
WEST PUBLISHING CO.
1990

his property. See *e.g.* 18 U.S.C.A. §§ 1341, 1342 (mail swindles).

*See* False pretenses; Fraud.

**Switch-yard doctrine.** The doctrine that there can be no implied license to the public to use the track of a railroad company within the limits of its switch-yard.

**Swoling of land.** Term in old English law, meaning so much land as one's plow can till in a year; a hide of land.

**Sworn.** Frequently used interchangeably with "verified." *See* Affirmation; Oath; Swear; Verify.

**Sworn brothers.** In old English law, persons who, by mutual oaths, covenant to share in each other's fortunes.

**Sworn clerks in chancery.** Certain officers in the English court of chancery, whose duties were to keep the records, make copies of pleadings, etc. Their offices were abolished by St. 5 & 6 Vict., c. 103.

**Sworn statement.** Listing by contractor-builder of all of his suppliers and sub-contractors and their respective bids. Such is required by lending institution for interim construction financing.

**Syb and som** /síb ǝnd sówm/. A Saxon form of greeting, meaning peace and safety.

**Syllabus.** An abstract; a headnote; a note prefixed to the report or opinion of an adjudged case, containing an epitome or brief statement of the rulings of the court upon the point or points decided in the case. The syllabus (in Supreme Court decisions) constitutes no part of the opinion of the Court but is prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499. Ordinarily, where a headnote, even though prepared by the court, is given no special force by statute or rule of court, the opinion is to be looked to for the original and authentic statement of the grounds of decision. Burbank v. Ernst, 232 U.S. 162, 34 S.Ct. 299, 58 L.Ed. 551. *See also* Digest; Headnote.

**Syllogism.** In logic, the full logical form of a single argument. It consists of three propositions (two premises and the conclusion), and these contain three terms, of which the two occurring in the conclusion are brought together in the premises by being referred to a common class.

**Sylva cædua** /sílva síydyuwa/. Lat. In ecclesiastical law, wood of any kind which was kept on purpose to be cut, and which, being cut, grew again from the stump or root.

**Symbiotic relationship.** When the action of government and private actors is so intertwined as to constitute a "symbiotic relationship," their combined activities will be viewed by the courts as constituting state involvement sufficient to invoke the "state action" doctrine and thereby subject the private actor, in such circumstances, to constitutional obligation. Burton v.

Wilmington Parking Authority, 38 Del.Ch. 266, 150 A.2d 197 (1961).

**Symbolæography** /simbǝliyógrǝfiy/. The art or cunning rightly to form and make written instruments. It is either judicial or extrajudicial; the latter being wholly occupied with such instruments as concern matters not yet judicially in controversy, such as instruments of agreements or contracts, and testaments or last wills.

**Symbolic delivery.** The constructive delivery of the subject-matter of a sale or gift, where it is cumbersome or inaccessible, by the actual delivery of some article which is conventionally accepted as the symbol or representative of it, or which renders access to it possible, or which is evidence of the purchaser's or donee's title to it. Thus, a present gift of the contents of a box in a bank vault, accompanied by a transfer of the key thereto, is valid as a symbolical delivery.

**Symbolic speech.** A person's conduct which expresses opinions or thoughts about a subject and which may or may not be protected by the First Amendment. Actions which have as their primary purpose the expression of ideas as in the case of students who wore black arm bands to protest the war in Viet Nam. Such conduct is generally protected under the First Amendment as "pure speech" because very little conduct is involved. Tinker v. Des Moines School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. However, not all such conduct is protected. The burning of a draft card was not protected speech because of the government's substantial interest. U. S. v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672. *See* Flag desecration.

**Symbolum animæ** /símbǝlǝm ǽnǝmiy/. Lat. A mortuary, or soul scot.

**Symmetry.** Due proportion of several parts of a body to each other; adaptation of the form or dimensions of the several parts of a thing to each other; harmonious relation of parts; conformance; consistency; congruity; correspondence or similarity of form, dimensions, or parts on opposite sides of an axis, center, or a dividing plane.

**Symond's inn.** Formerly an inn of chancery.

**Sympathy strike.** A boycott. *See* Boycott; Strike.

**Synallagmatic contract** /sinǝlægmǽtǝk kóntrækt/. In the civil law, a bilateral or reciprocal contract, in which the parties expressly enter into mutual engagements, each binding himself to the other. Such are the contracts of sale, hiring, etc.

**Syncopare.** To cut short, or pronounce things so as not to be understood.

**Syndic** /síndǝk/. In the civil law, an advocate or patron; a burgess or recorder; an agent or attorney who acts for a corporation or university; an actor or procurator; an assignee. The term corresponds very nearly with that of assignee under the common law.

In English common law, an agent appointed by a corporation for the purpose of obtaining letters of guardianship and the like, to whom such letters were issued.

# EXHIBIT I

# ALSTON & BIRD

## Jacob L. Kaplan
**Senior Associate**

404.881.4296
jake.kaplan@alston.com
**Atlanta** | One Atlantic Center, 1201 West Peachtree Street, Suite 4900 | Atlanta, GA 30309-3424



*Jake develops personalized strategies that minimize taxes for his clients and their businesses. His efficient approach guides families, health care systems, and other tax exempt organizations through the nuanced tax laws and regulations that govern them.*

Jake Kaplan is a senior associate with Alston & Bird's Wealth Planning and Exempt Organizations Group. He focuses his practice in the areas of estate planning, exempt organizations, New Markets Tax Credit (NMTC) financings, health care restructurings, mergers and acquisitions, and federal taxation. Jake draws on his rich and varied experiences to benefit a diverse group of clients whose needs often overlap across Jake's areas of expertise. He advises individuals, families, and fiduciaries on tax issues, estate planning strategies, philanthropic plans, and estate administration procedures and best practices. Jake counsels exempt organizations on a myriad of specialized tax, governance, formation, and operational issues. He represents hospitals, schools, other exempt organizations, and community development entities in federal NMTC financings that help non-profits fund important real estate redevelopment projects.  He also counsels health care clients on a range of tax and governance issues, with significant experience designing and implementing organizational structures for such clients in M&A transactions and internal restructurings.

Jake has been listed twice in "Ones to Watch" by *The Best Lawyers in America*© for Trusts & Estates Law and as an "Associate to Watch" by *Chambers HNW* in Private Wealth Law.

Jake earned his J.D. and M.B.A., with high honors, from Emory University, where he was elected to the Order of the Coif and served on the executive board of the *Emory Bankruptcy Developments Journa*l.

### Representative Experience

- Designed and implemented tax-advantageous estate planning, wealth transfer, and charitable planning strategies for a variety of domestic and international clients.

- Counseled fiduciaries on intricate tax, probate, estate, and trust administration matters.

- Advised tax-exempt public charities and private foundations on a range of issues, including corporate formation and governance, obtaining and maintaining tax-exempt status, compliance with federal tax reporting and charitable solicitation registration requirements, and responding to IRS audits.

- Represented hospitals, schools, other non-profit organizations (QALICBs), and community development entities (CDEs) in federal New Markets Tax Credit (NMTC) financings for real estate redevelopment projects.

- Designed and effectuated preferred organizational structures for hospital systems and other health care entities to optimize tax and governance outcomes in M&A transactions and internal restructurings.

- Prepared an IRS-compliant COVID-19 major disaster leave-bank policy for a private non-profit college.

### Publications & Presentations

### Publications

- "Insight: Transfer Tax and Estate Planning Considerations for Clients with Cryptoassets (Part 2)," *Bloomberg Tax,* January 22, 2020.

# ALSTON & BIRD

## John F. Baron
### Partner

704.444.1434
john.baron@alston.com
**Charlotte** | One South at The Plaza, 101 South Tryon Street, Suite 4000 | Charlotte, NC 28280-4000



*John has provided clients tax structuring advice on all aspects of mergers and acquisitions and other transactions for more than 25 years.*

John Baron leads Alston & Bird's Federal & International Tax Group and is the former chair of the firm's Partners Committee. His practice is principally transactional in nature, and his clients include both domestic and foreign companies and financial institutions, as well as private equity firms, CDOs, and hedge funds. He regularly provides tax structuring advice and renders tax opinions with respect to mergers and acquisitions, structured finance transactions, securitizations involving REMICS, grantor trusts and CDOs, and cross-border financings.

John is a member of the Tax Section of the New York Bar Association, the International Fiscal Association (treasurer, Carolinas Chapter) and CREFC REMIC Task Force. John received his J.D. from Seton Hall University in 1987 and his LL.M. in taxation from New York University in 1990. He received his B.A. in 1984 from the University of Delaware. He is admitted to practice in North Carolina, New York and New Jersey.

### Representative Experience

- Advises on structuring mergers, acquisitions and joint ventures, including the use of tax-favored "pass-through" entities.

- Advises on inbound and outbound international transactions.

- Advises on tax structuring and issuance of opinions relating to various financial transactions, including tax aspects of debt and equity securities offerings.

- Advises on tax aspects of real estate transactions, including like-kind exchanges, installment sales, structured financing arrangements, and transfers involving REITs and REMICs.

- Advises on tax aspects of offshore investment funds.

- Advised on REMIC securitization tax issues representing special servicers during the financial crisis for large hotel CMBS loans including such resorts as the Atlantis Hotel in the Bahamas and the Boca Beach Resort Hotel.

### Education

- New York University (LL.M. Taxation, 1990)

- Seton Hall University (J.D., 1987)

- University of Delaware (B.A., 1984)

### Admitted to Practice

- North Carolina

- New York

- New Jersey

# ALSTON & BIRD

## Mark Williamson
Partner



404.881.7993
mark.williamson@alston.com
**Atlanta** | One Atlantic Center, 1201 West Peachtree Street, Suite 4900 | Atlanta, GA 30309-3424

*As a Fellow of the American College of Trust and Estate Counsel and a part-time law professor, Mark has extensive experience and knowledge in estate planning and federal taxation. Mark is a professional musician and author of a BNA Tax Management Portfolio on tax treaties.*

Mark Williamson is a partner and chair of Alston & Bird's Wealth Planning and Exempt Organizations Teams. He is a Fellow of the American College of Trust and Estate Counsel and practices in the areas of estate planning and federal taxation.

Mark practiced with the Milwaukee law firm of Foley & Lardner before joining Alston & Bird and has been an adjunct professor of law at the University of Wisconsin in Madison and Georgia State University in Atlanta. He has been a recurring faculty member of the annual Estate Planning Institute and Fiduciary Law Institute presented by the State Bar of Georgia Fiduciary Law Section.

In 1997, Mark received the *Trusts & Estates* magazine "Best Young Author Award" for a series of articles he co-authored with Professor Jeffrey Pennell of Emory University and is the author of a BNA Tax Management Portfolio on tax treaties for individuals. *The Best Lawyers in America*© recognized Mark as "Lawyer of the Year" in Trust and Estates in 2019 and in Tax Law in 2020. Mark has been named to the Georgia *Super Lawyers* list since 2004 and *Chambers* recognizes him as a Band 1 lawyer in Private Wealth Law – Georgia.

Mark also studied music at the doctorate level at Louisiana State University and the Catholic University of America, and continues to perform professionally, including a three-week tour of China in 2011–2012.

### Representative Experience

- Works on a wide variety of tax and non-tax controversies, including fiduciary litigation, tax audits and litigation, divorce tax and estate planning issues, non-profit workouts and restructurings, and offshore voluntary disclosure matters.

### Publications & Presentations

### Publications

- "Family Limited Partnership Regs Target Valuation Discounts," *Tax Notes,* Vol. 152, No. 11, September 12, 2016.

### Professional & Community Engagement

- Georgia Lawyers for the Arts and Jazz Orchestra Atlanta, Board Chair
- The Charles Loridans Foundation, trustee
- Founder and music director of the brass chamber music group *Il Brasso Magnifico*
- Order of the Coif
- Florida State University Law School, Board of Visitors
- United States Air Force Band, 1984 – 1988
- State Bar of Georgia, Fiduciary Law Section, former chair

# ALSTON & BIRD

## Blake C. MacKay
Partner



404.881.4982
blake.mackay@alston.com
**Atlanta** | One Atlantic Center, 1201 West Peachtree Street, Suite 4900 | Atlanta, GA 30309-3424

*Blake provides responsive and practical advice to solve complex employee benefit challenges facing public, private and tax-exempt employers. Clients seek his insight to resolve complicated plan audit and correction issues with the IRS, DOL and PBGC. He advises on all aspects of retirement plan design and compliance issues for 401(k), 403(b), 457, 409A, ESOP and defined benefit pension plans.*

Blake MacKay serves as the Compensation, Benefits & ERISA Litigation Group leader. He concentrates his practice on assisting employers in the design and compliance of qualified retirement plans and cash-based deferred compensation arrangements and handling all aspects of employee benefits in mergers, acquisitions, and related financial transactions. Blake's practice involves advising clients on matters related to qualified retirement plans (including pension, cash balance, profit-sharing, 401(k) and ESOPs), 403(b) plans, 457(b) plans and other retirement and deferred compensation plans for tax-exempt entities. Blake assists clients with the voluntary correction of errors involving qualified retirement plans with the IRS and DOL, as well as with legal audits with the IRS, DOL and PBGC. He also advises clients with respect to the ERISA and tax aspects of executive deferred compensation arrangements, including compliance with Internal Revenue Code Section 409A. Blake is a former adjunct professor at Emory Law School in Atlanta, Georgia, where he taught the ERISA and Employee Benefits course.

### Representative Experience

- Represented employers in negotiations with the PBGC regarding liability under ERISA Section 4062(e).

- Represented numerous employers regarding the design, implementation and administration of all types of qualified retirement plans and deferred compensation arrangements, including advice on regulatory compliance with the Internal Revenue Code and ERISA.

- Represented many large public companies, private employers and private equity funds regarding the employee benefits issues related to corporate mergers and acquisitions, including advising these employers on the integration of their benefit plans and executive compensation arrangements.

- Represented many employers regarding voluntary correction of errors involving qualified retirement plans, including errors relating to tax qualification and ERISA fiduciary requirements.

- Represented employers regarding qualified retirement plan spinoffs, plan mergers, transfers of assets and liabilities, and plan terminations.

- Drafted amendments to hundreds of non-qualified deferred compensation arrangements and individual executive agreements for compliance with Code Section 409A.

### Publications & Presentations

### Publications

- "Costs to Pension Withdrawal Liability May Change," *Law360*, August 28, 2014.

# ALSTON & BIRD

## Glenn G. Patton
**Partner**

404.881.7785
glenn.patton@alston.com
**Atlanta** | One Atlantic Center, 1201 West Peachtree Street, Suite 4900 | Atlanta, GA 30309-3424



Glenn Patton is a partner in the Labor & Employment Group. He represents management in all areas of employment-related litigation, including employment discrimination claims, wage/hour litigation and restrictive covenant disputes. Glenn also represents management in traditional labor matters, including contract negotiations, labor arbitrations and unfair labor practice charges. In addition to his litigation experience, Glenn counsels numerous clients on day-to-day HR and compliance issues and serves as the firm's employment counsel. Glenn is recognized as a leading labor and employment lawyer in the 2015-2022 editions of *The Best Lawyers in America©* and has been recognized as a leading employment lawyer by *Chambers USA: America's Leading Lawyers for Business* since 2006. Glenn is also a nationally recognized speaker on employment matters at CLE programs, bar events, management training programs and the firm's executive seminars.

### Representative Experience

- Representation of the world's premier package delivery and logistics company in a nationwide ADA class action filed in Pennsylvania and in all employment litigation matters in Georgia, North Carolina and South Carolina.

- Multiple representations of a leading financial institution in nationwide FLSA collective action cases filed in California and Georgia.

- Representation of a leading home health care provider in traditional labor and wage/hour litigation around the country.

- Recently obtained summary judgment for a leading clinical research organization in a multi-plaintiff FLSA lawsuit in S.D. Texas.

- Obtained summary judgments in three pattern and practice race discrimination cases brought by the leading plaintiff's class action firms against one of the world's largest energy and petrochemical companies.

- Multiple representations of employers defending ADA and GINA claims arising out of employer wellness programs.

- Represents numerous clients, including one of the nation's largest financial institutions, a national document management company and a leading home health care provider, in collective actions filed in Florida, Georgia and Mississippi seeking unpaid overtime under the Fair Labor Standards Act.

- Serves as lead counsel in all employment matters in Georgia and South Carolina for the world's largest parcel delivery and logistics companies.

- Obtained a directed verdict in a Title VII and § 1981 retaliation case tried to a jury in Jacksonville, Florida.

- Negotiates collective bargaining agreements with PACE, IBEW, IAM and the IBT, and arbitrates numerous labor disputes regarding contract interpretation and employee discipline.